BRUCE A. WAGMAN (SBN 159987)
bwagman@rshc-law.com
Riley Safer Holmes & Cancila, LLP
456 Montgomery Street, 16th Floor
San Francisco, CA 94104
Telephone: 415.275.8540
Facsimile: 415.275.8551

*Attorneys for Plaintiffs The Humane Society
of the United States, Animal Outlook,
Mercy for Animals, Government Accountability
Project, and Marin Humane*

MARGARET ROBINSON (D.C. Bar No. 241415)*
mrobinson@humanesociety.org
Telephone: 202.676.2369
PETER A. BRANDT (SBN 241287)
pbrandt@humanesociety.org
Telephone: 240.388.5023
JONATHAN R. LOVVORN (SBN 187393)
jlovvorn@humanesociety.org
Telephone: 202.515.1854
The Humane Society of the United States
1255 23rd Street NW, Suite 450
Washington, DC 20037
Fax: 202.778.6126

*Attorneys for Plaintiff The Humane Society
of the United States*

[*Pro Hac Vice application forthcoming]

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| THE HUMANE SOCIETY OF THE UNITED STATES, ANIMAL OUTLOOK, MERCY FOR ANIMALS, GOVERNMENT ACCOUNTABILITY PROJECT, and MARIN HUMANE, <br><br> Plaintiffs, <br><br> v. | Case No.   3:20-cv-1395 <br><br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** <br><br><br> (Administrative Procedure Act case) |

1
2
3
4
5

SONNY PERDUE, in his official capacity as the Secretary of Agriculture, CARMEN ROTTENBERG, in her official capacity as Administrator, Food Safety and Inspection Service, UNITED STATES DEPARTMENT OF AGRICULTURE, and FOOD SAFETY AND INSPECTION SERVICE,

Defendants.

6
7

**INTRODUCTION**

8
9
10
11
12
13
14
15
16
17
18
19
20

1.   In many commercial slaughterhouses across the country, chickens are hastily shackled—by their legs and upside down—to a fast-moving line where they are supposed to be stunned, then killed, and finally submerged in scalding water at a rate of 140 birds *each minute*. Because of the rapid speed at which the chickens are processed, millions (if not billions) of birds suffer extreme cruelty during the process every year, and an untold number are drowned or scalded to death while fully conscious. This high speed also causes many workers to suffer painful injuries and exposes consumers to food contamination and illness. Additionally, the slaughter process consumes huge amounts of water and produces vast amounts of wastewater. Despite these problems, the federal agency overseeing slaughter—which has long recognized the connection between animal welfare and food safety—has decided to authorize a 25 percent increase in chicken slaughter line speeds, virtually guaranteeing increases in animal cruelty and public health dangers.

21
22
23

2.   This lawsuit challenges the U.S. Department of Agriculture's ("USDA") and its Food Safety and Inspection Service's ("FSIS")[1] 2018 increase of slaughter line speed limits at

24
25
26
27
28

[1] Defendants USDA and FSIS, along with Defendants Perdue and Rottenberg, are collectively referred to as "FSIS" or "agency."

Complaint for Declaratory and Injunctive Relief

chicken slaughterhouses. Through a February 2018 Constituent Update[2] and a September 2018 Federal Register notice,[3] FSIS made its 2018 Line Speed Increase Decision, which clears the way for dozens of slaughterhouses to kill chickens at an increased rate of 175 birds per minute ("bpm"), or roughly three birds every second. Not only did the agency authorize this increase in speed limit, the agency's decision forces facilities that decide to speed up to operate at least one line faster than the previous recklessly high limit or risk losing the ability to operate at higher speeds altogether. Increasing line speeds to 175 bpm will result in more inhumane treatment of chickens, which FSIS has long recognized seriously threatens food safety. It will also cause harm to the environment and result in increased risk of injury for slaughterhouse employees.

3.     During the 2012 to 2014 rulemaking process creating the New Poultry Inspection System ("NPIS"), an optional federal inspection system for poultry slaughterhouses, FSIS considered—and ultimately rejected—the exact line speed increase that it has now approved. In 2014, after receiving a prodigious number of comments opposing the agency's proposed speed increase, FSIS prohibited most NPIS chicken slaughterhouses from operating above 140 bpm. The agency, however, provided a narrow exception that allowed no more than 20 slaughterhouses to operate at speeds of up to 175 bpm. Yet, less than five years later and without engaging in rulemaking or providing any acceptable justification, the agency issued its 2018 Line Speed

---

[2] FSIS, *FSIS' Criteria for Consideration of Waiver Requests from Young Chicken Slaughter Establishments to Operate at Line Speeds Up to 175 Birds Per Minute*, FSIS Constituent Update, Feb. 23, 2018 (hereinafter "Constituent Update").

[3] Petition To Permit Waivers of Maximum Line Speeds for Young Chicken Establishments Operating Under the New Poultry Inspection System; Criteria for Consideration of Waiver Requests for Young Chicken Establishments To Operate at Line Speeds of Up to 175 Birds per Minute, 83 Fed. Reg. 49,048 (Sept. 28, 2018) (hereinafter "2018 Federal Register Line Speed Notice"). (The Constituent Update and the 2018 Federal Register Line Speed Notice are collectively referred to in this Complaint as "2018 Line Speed Increase Decision" or "Decision.")

Increase Decision. This decision allows an unlimited number of NPIS chicken slaughterhouses to operate at a maximum speed of 175 bpm, and as noted, forces those that opt in to operate faster than the previous line speed limit or risk losing the federal government's authorization to operate at 175 bpm.

4.    The 2018 Line Speed Increase Decision violates the Administrative Procedure Act ("APA"), the Poultry Products Inspection Act ("PPIA"), and the National Environmental Policy Act ("NEPA"). The agency denied affected communities, workers, consumers, and advocates (such as Plaintiffs) the right to participate in the agency's rulemaking process as required by the APA. Additionally, the 2018 Line Speed Increase Decision violates an FSIS regulation setting out the requirements that must be met for the agency to waive regulatory provisions. Further, without providing adequate explanation, FSIS has deviated from past agency positions, in violation of the APA. And increased line speeds permitted, and effectively mandated, under the Decision will result in more violations of the PPIA, FSIS's own regulations, and FSIS policy. Finally, despite the 2018 Line Speed Increase Decision's potential for far-reaching environmental impacts, FSIS made its Decision without complying with NEPA's clear mandate for environmental review.

5.    This suit seeks declaratory and injunctive relief, including an order vacating FSIS's 2018 Line Speed Increase Decision and all waivers issued under that decision. Plaintiffs also ask this Court to remand the matter to the agency and to enjoin FSIS from making any future chicken slaughterhouse line speed increases unless the agency complies with the APA, the PPIA, and NEPA.

**JURISDICTION**

6.    This Court has jurisdiction over this action under 28 U.S.C. § 1331 (action arising under the laws of the United States), *id.* § 1361 (action to compel officer or agency to perform

duty owed to Plaintiffs), and 5 U.S.C. §§ 701–06 (the APA). The agency action challenged in this lawsuit is final agency action subject to judicial review. *See* 5 U.S.C. §§ 702, 704, 706. This Court may grant declaratory relief, injunctive relief, and other relief pursuant to 28 U.S.C. §§ 2201–02 and 5 U.S.C. §§ 705–06.

## VENUE

7.      Under 28 U.S.C. § 1391(e), venue is proper in the Northern District of California because this action is brought against agencies of the United States and officers of the United States acting in their official capacities, no real property is involved in the action, and Plaintiff Marin Humane is located in and maintains its principal place of business in Novato, California.

## INTRADISTRICT ASSIGNMENT

8.      This case is properly assigned to the San Francisco Division under Civil L.R. 3-2(c) and 3-2(d) because Plaintiff Marin Humane has its principal place of business in Novato, California, which is in Marin County.

## PARTIES

9.      Plaintiff THE HUMANE SOCIETY OF THE UNITED STATES ("HSUS") is a nonprofit organization headquartered in the District of Columbia, with regional offices and several direct animal care facilities located throughout the country. HSUS is the largest animal protection organization in the United States, representing millions of members and constituents nationwide. HSUS actively advocates for better laws and regulations to protect animals and the environment; conducts mission-specific campaigns to increase protections for domestic animals and wildlife; and advocates against practices that injure, harass, or otherwise harm animals, including farm animals. Specifically, with its mission to end suffering for all animals, HSUS endeavors to raise awareness about farm animal confinement, raising, and slaughter practices through its farm animal welfare campaign. This campaign actively advocates to regulate such

farm animal practices through efforts with administrative agencies, Congress, state legislatures, and the courts. It also engages in advocacy to bring awareness to, and combat, the environmental impact of farm animal production and slaughter practices.

10.     HSUS's farm animal welfare campaign is strongly committed to educating the public about pollution and public health threats from industrialized animal agriculture. The organization's members rely on HSUS for information regarding the impacts of animal agriculture on human health, the environment, and farm animal welfare. And the organization engages in efforts to mitigate these impacts on behalf of its members. To these ends, HSUS has invested considerable organizational resources in public education, research and investigation, and litigation concerning farm animal welfare, public health, and the environment.

11.     Because of HSUS's and its members' interest in the impacts the slaughter process has on animal welfare, human health and safety, and the environment, HSUS has consistently been involved in FSIS's development of regulations regarding slaughterhouses, including its regulation of the slaughter line speeds at such facilities. For example, HSUS submitted comments during FSIS's NPIS rulemaking process, including comments criticizing the agency's original proposal to increase line speed maximums to 175 bpm. HSUS was able to commit its limited resources to other priorities in its farm animal advocacy campaign after FSIS rejected chicken line speed increases in 2014. However, the agency's renewed effort to increase line speeds has required HSUS to divert resources back to the issue (although the organization has been significantly limited in its ability to do so because of the procedural deficiencies inherent in FSIS's 2018 Line Speed Increase Decision discussed below).

12.     HSUS submitted comments opposing an industry-driven petition that asked FSIS to create a waiver program to allow chicken slaughterhouses to operate without *any* restriction on line speed. HSUS also submitted comments in response to a 2018 FSIS proposed rule that would,

among other things, revoke the maximum line speed at which pig slaughterhouses can operate, instead allowing such facilities to set their own line speeds.

13.     HSUS, on its own behalf and on behalf of its members, has a procedural interest in ensuring that FSIS fully considers the information HSUS submits through its extensive participation as a party interested in the agency's development of regulations regarding line speeds at chicken slaughterhouses. HSUS, on its own behalf and on behalf of its members, also has a procedural interest in ensuring that FSIS provides for sufficient public participation—and fully considers information submitted in the course of such public participation—before finalizing and implementing any such regulations. Additionally, HSUS, on its own behalf and on behalf of its members, has a procedural interest in ensuring that FSIS fully considers the environmental impacts of its actions, including those relating to farm animal production and slaughter, through the procedures created by NEPA. HSUS, on its own behalf and on behalf of its members, has a procedural interest in ensuring that FSIS allows sufficient public participation—and fully considers information submitted in the course of such public participation—before finalizing major federal actions significantly affecting the quality of the human environment. These interests were injured by FSIS's failure to engage in the rulemaking process required by the APA and to conduct adequate environmental review as required by NEPA before making the 2018 Line Speed Increase Decision. As a result of FSIS's conduct, HSUS, on behalf of its members, was deprived of the opportunity to comment on the 2018 Line Speed Increase Decision through both APA and NEPA procedures.

14.     Further, HSUS members spend time near slaughterhouses that are permitted and effectively required to operate at higher line speeds under the 2018 Line Speed Increase Decision or live near factory farms that supply such slaughterhouses, including members in Batesville, Arkansas; Imboden, Arkansas; and West Columbia, South Carolina. These members are subject

to aesthetic, health, environmental, and/or other harm resulting from these slaughterhouses' operations, including from the noxious stench emitted from such slaughterhouses and pollution from trucks carrying chickens on their way to be killed at such facilities. These harms very likely have been and will continue to be worsened because of the increased speeds at which such slaughterhouses operate under the 2018 Line Speed Increase Decision, which increases the number of chickens killed in an hour and allows slaughterhouses to kill more birds than they otherwise would be able to if they were limited to speeds of 140 bpm.

15.     Because of FSIS's failure to conduct an environmental review under NEPA, HSUS members living near slaughterhouses permitted to operate at line speeds of up to 175 bpm under the 2018 Line Speed Increase Decision or near factory farms that supply such slaughterhouses have been deprived of information regarding how the Decision will affect the environment in their communities and nationally.

16.     Additionally, HSUS members living in or near communities with slaughterhouses operating at line speeds of up to 175 bpm under the 2018 Line Speed Increase Decision have been and will continue to be at increased risk of suffering aesthetic and emotional injury resulting from seeing chickens kept in cruel conditions on the trucks that transport them from the facilities where they are grown to the slaughterhouses where they will be killed.

17.     If FSIS had conducted notice-and-comment rulemaking when making its 2018 Line Speed Increase Decision and conducted an environmental review of that decision, then HSUS's and its members' procedural injuries would be redressed. Had it had an opportunity to comment, HSUS would have raised the legal, animal welfare, food safety, and environmental defects inherent in FSIS's 2018 Line Speed Increase Decision on behalf of the organization and its members. Accordingly, if this Court ordered FSIS to follow proper rulemaking and NEPA procedures before increasing line speeds at chicken slaughterhouses, it would redress HSUS's

procedural injuries. Moreover, if the agency was required to engage in such procedure, it could result in different and better agency action in response to issues raised in HSUS's and others' comments.

18.     Had FSIS conducted an environmental review under NEPA, HSUS members near slaughterhouses operating at increased line speeds under the 2018 Line Speed Increase Decision or near factory farms that supply such slaughterhouses, would have additional information about the potential environmental impacts of the Decision. If this Court ordered FSIS to follow proper NEPA procedure before increasing line speeds at chicken slaughterhouses, it could redress this informational injury.

19.     Further, if this Court ruled in favor of Plaintiffs, chicken slaughterhouses would no longer be permitted (and effectively required) to operate at higher line speeds and instead would be required to operate at a maximum line speed of 140 bpm. This would likely redress HSUS's members aesthetic, health, environmental, emotional, and/or other injuries as described in Paragraphs 14 and 16.

20.     Plaintiff ANIMAL OUTLOOK ("AO") (formerly COMPASSION OVER KILLING) is a nonprofit organization incorporated in Delaware and with its principal place of business in the District of Columbia. Founded in 1995, AO's organizational mission is to change the world for animals. AO works to challenge the status quo of animal agribusiness, expose the truth, deliver justice, revolutionize food systems, and empower others to stand up for animals by leaving them off of their plates. In furtherance of its mission, AO conducts undercover investigations of factory farms and industrialized slaughterhouses; advocates against government policies that encourage or allow cruelty to farm animals; and coordinates public campaigns to encourage the adoption of vegan diets.

21.     AO also conducts public education on the realities of industrial animal agriculture and expends a significant amount of its resources on these education efforts. A consistent core component of its messaging has been education on the link between environmental degradation and animal agriculture. For example, AO has produced and used for years a brochure dedicated entirely to the topic of the environmental impact of animal agribusiness, called "Eating Sustainably." In addition, AO's main piece of educational literature has a section dedicated to environmental arguments for diet change. The environmental impact of animal agriculture is of great importance to AO's mission, and the organization has expended resources to develop and continue to maintain and distribute this educational material, due to the continued environmental degradation caused by industrial animal agriculture.

22.     The 2018 Line Speed Increase Decision will increase the likelihood that animals are treated inhumanely, directly frustrating AO's mission. In November 2018, AO released an investigation of Amick Farms, a chicken slaughterhouse on Maryland's Eastern Shore that FSIS allows to operate at line speeds of up to 175 bpm. AO conducted this investigation from May to August 2018. In its investigation of Amick Farms, AO documented more than 100 incidents of animal cruelty attributable to the high line speeds permitted by FSIS, including rough hanging, improper stunning, animals killed or dying otherwise than by slaughter, and ineffective slaughter. The 2018 Line Speed Increase Decision increases the risk of such cruelty.

23.     AO intends to continue conducting investigations at chicken slaughterhouses permitted to operate at higher line speeds. The 2018 Line Speed Increase Decision will increase the likelihood that AO's investigators are injured while working on high-speed slaughter lines.

24.     In some instances, workplace injuries caused by the high-speed slaughter lines permitted by the Decision will compel AO to spend more time and resources on investigations, instead of being able to focus on other core work of the organization.

25.     AO suffered direct economic harm because of the increased line speeds at Amick Farms because the organization was required to compensate its investigator more than anticipated, specifically because of the investigator's injuries caused by the increased line speeds. Thus, AO suffered both economic injury, and was forced to divert its resources from other programs, specifically because of the increased line speeds at Amick Farms.

26.     The 2018 Line Speed Increase Decision will also increase the length of time and resources AO spends at high-speed facilities in order to document heightened cruelty attributable to increased line speeds.

27.     In fact, AO's resources were diverted and its mission was frustrated by the widespread cruelty and violations of good commercial practices at Amick Farms. Those violations caused AO to expend and divert significant resources from its core mission and goals in order to remain at the facility for a much longer period of time so that AO could attempt to fully document the many problems caused by increased line speeds.

28.     Given this experience, it is clear that AO will suffer direct economic harm if it undertakes these investigations because of the higher line speeds permitted under the 2018 Line Speed Increase Decision. Investigations are a priority activity for AO, and increased line speeds will continue to impact AO by driving up the cost of investigations in facilities permitted to operate at increased speeds under the Decision. AO will suffer additional economic injury because in some cases, AO will spend resources deploying investigators who will be forced to end investigations early because of injuries. In other cases, workplace injuries will cause an investigation to be entirely unsuccessful. These investigators will not be able to accomplish the work AO pays them to do as often or as easily. In other cases, AO will need to remain at a facility longer than planned to document increased cruelty. This will cause direct harm to AO's mission and finances.

Complaint for Declaratory and Injunctive Relief

29.     In connection with the economic harm, the increased line speeds permitted and effectively required by the 2018 Line Increase Speed Decision will also undermine the core function of the organization by impairing its ability to carry out those investigations.

30.     As a result of FSIS's 2018 Line Speed Increase Decision, AO also will likely be forced to divert scarce resources from core work of the organization (including investigations into other areas of industrialized animal agriculture not including high slaughter line speeds) to conduct additional investigations of chicken slaughterhouses that FSIS permits to operate at higher line speeds under the Decision, so that AO can raise public awareness of the cruelty to which the animals are subjected at these faster speeds. AO already has conducted targeted investigations of high-speed slaughterhouses (for both chickens and pigs) in support of its campaign against FSIS's policies. As FSIS permits more chicken slaughterhouses to operate at faster line speeds, AO will be forced to focus its limited resources on costlier and more resource-intensive investigations at a significantly larger number of slaughterhouses operating pursuant to the 2018 Line Speed Increase Decision.

31.     In fact, one of the reasons AO conducted an investigation at Amick Farms was because the facility operates at higher line speeds. AO previously investigated a pig slaughter facility operating at accelerated line speeds and was familiar with the associated animal welfare issues. Therefore, AO conducted the investigation at Amick Farms, in part, to document the impacts increased line speed has on animal welfare at chicken slaughterhouses.

32.     In addition, AO's resources have been diverted from other litigation and communication activities to AO's efforts to combat the 2018 Line Speed Increase Decision and to educate the public about the Decision, including through correspondence with USDA and social media efforts aimed at AO's supporters.

Complaint for Declaratory and Injunctive Relief

33.     FSIS's 2018 Line Speed Increase Decision will continue to frustrate AO's mission and require the organization to divert resources as described above. Because increased line speeds are particularly detrimental to animal welfare, AO will continue to divert and expend resources to oppose the 2018 Line Speed Increase Decision and to educate the public about the Decision. AO also intends to continue investigating chicken slaughterhouses operating at higher line speeds in order to carry out its mission to eradicate cruel and abusive treatment of farmed animals. Increased slaughter line speeds run directly counter to AO's mission, and so FSIS's Decision will require diversion of the organization's limited resources to combat the heightened cruelty associated with this decision. But for the agency's actions described herein, AO would not divert and expend resources as described above.

34.     The increased line speeds permitted by FSIS will also cause AO to suffer business injury and economic harm as described above. But for the agency's actions described herein, AO would not suffer such injury.

35.     Were the agency to reverse its 2018 Line Speed Increase Decision, AO's mission would no longer be frustrated by the additional cruelty at slaughterhouses attributable to faster line speeds under the Decision; AO would no longer be forced to expend resources to specifically investigate high-speed chicken slaughterhouses, oppose the 2018 Line Speed Increase Decision, or educate the public about the Decision; and AO would not suffer business injury and economic harm resulting from investigators who are not able to accomplish their work as often or as easily. AO also would face a reduced risk that its resources would be drained by investigator injuries caused by faster line speeds.

36.     AO joined Plaintiffs HSUS and Mercy for Animals in submitting comments to FSIS that opposed a petition by industry representatives to increase line speeds at chicken slaughterhouses.

37.     AO has a procedural interest in ensuring that FSIS fully considers the information AO submits through its participation in the agency's development of regulations regarding line speeds at chicken slaughterhouses. AO also has a procedural interest in ensuring that FSIS provides for sufficient public participation—and fully considers information submitted in the course of such public participation—before finalizing and implementing any such regulations. These interests were injured by FSIS's failure to engage in the rulemaking process required by the APA and to conduct adequate environmental review as required by NEPA before issuing the 2018 Line Speed Increase Decision. As a result of FSIS's conduct, AO was deprived of the opportunity to comment on the 2018 Line Speed Increase Decision.

38.     Plaintiff MERCY FOR ANIMALS ("MFA") is a nonprofit organization incorporated in Delaware and with its principal place of business in Los Angeles, California. Founded in 1999, MFA represents millions of supporters throughout the world. MFA's mission is to construct a compassionate food system by reducing suffering and ending the exploitation of animals for food. To achieve these objectives, MFA works with companies to adopt animal welfare policies and plant-based alternatives to animal products, advocates for government policies that reduce the suffering of animals used for food, and educates the public regarding farm animal welfare and the dire environmental consequences of animal agriculture.

39.     MFA, USDA, and others have documented that the most common incidents of inhumane treatment at poultry slaughterhouses involve birds being scalded alive, birds suffering from inadequate shackling, stunning, cutting, or worker handling, and mechanical problems resulting in injury or death. These humane handling and slaughter issues are associated with fast line speeds—birds being improperly hung by workers struggling to keep up with the speed of the line, birds whose carotid arteries are not cut because the birds are moving too fast, and birds going into the scalding tank while still alive.

40.    MFA's investigative exposés have documented these chronic and systemic problems with poultry slaughter, as well as the devastating environmental impacts of industrialized animal agriculture. For example, MFA documented inhumane treatment and cruelty at a facility operated by Tyson Foods, Inc., which was allowed to operate at higher line speeds during a pilot test program. MFA's exposé revealed harsh and abusive handling, improper shackling, birds dying on the conveyor belt due to suffocation or heat exhaustion, and birds missing the kill blade and having their heads ripped off while they were still conscious and able to feel pain.

41.    In addition to publishing investigative exposés, MFA educates the public on poultry slaughter practices and works with companies to adopt practices that reduce the suffering associated with high-speed slaughter lines. In particular, MFA works with companies to transition away from the hanging and shackling of live birds during the slaughter process.

42.    MFA has participated in FSIS's development of regulations regarding slaughter, including its regulation of line speeds. MFA submitted comments in response to an industry-driven petition to FSIS, which, had requested a waiver system that would allow poultry slaughter facilities to operate without any restriction on line speed, petitioned FSIS to include poultry within the protections of the Humane Methods of Slaughter Act and the Humane Slaughter Provisions of the Federal Meat Inspection Act, and submitted comments in response to a 2018 FSIS proposed rule that would revoke the maximum line speeds (and allow unlimited speeds) for facilities that slaughter pigs. MFA has written to and met with policymakers, while also using blogs, social media, and traditional news media to educate the public on the dangers posed by increased slaughter line speeds.

43.    FSIS's 2018 Line Speed Increase Decision frustrates MFA's mission by dramatically increasing the number of animals who will experience the cruelty that results from

increased line speeds. Additionally, by enabling facilities to operate at higher line speeds, FSIS allows companies to continue the inhumane practices of hanging and shackling more live birds—frustrating MFA's corporate outreach work that is specifically aimed at eliminating live hanging and shackling. As a result of the 2018 Line Speed Increase Decision, MFA has had to divert its resources away from its core activities, which include corporate outreach work, public education, and investigations into other areas of industrialized animal agriculture not including high-speed slaughter line. In particular, MFA has been forced to divert its resources from core activities such as investigative exposés relating to other animals or other aspects of farmed animal welfare, in order to focus investigative work on chicken slaughter facilities operating at heightened line speeds under the 2018 Line Speed Increase Decision.

44.    Were the agency to reverse its 2018 Line Speed Increase Decision, MFA's mission would no longer be frustrated by the cruelty and inhumane treatment caused by the faster line speeds permitted under the Decision. MFA would no longer be forced to expend resources to investigate facilities that operate at heightened line speeds and educate its supporters and the public on the effects of heightened line speeds.

45.    MFA has a procedural interest in ensuring that FSIS fully considers the information MFA submits through its participation as a party interested in the agency's development of regulations regarding line speeds at poultry slaughter facilities. MFA also has a procedural interest in ensuring that FSIS provides for sufficient public participation—and fully considers information submitted in the course of such public participation—before finalizing and implementing any such regulations. MFA was injured by FSIS's failure to engage in the rulemaking process required by the APA and to conduct adequate environmental review as required by NEPA before making its 2018 Line Speed Increase Decision. As a result of FSIS's

conduct, MFA, on behalf of its supporters, was deprived of the opportunity to comment on the 2018 Line Speed Increase Decision.

46.     Plaintiff GOVERNMENT ACCOUNTABILITY PROJECT ("GAP") is a nonprofit organization incorporated in and with its principal place of business in the District of Columbia. Founded in 1977, GAP's organizational mission is to promote corporate and government accountability by protecting whistleblowers and promoting social and political awareness of the accountability whistleblowers provide to our democratic society. GAP furthers its goal by focusing its efforts and resources on four separate areas: (1) educational outreach, (2) legislative initiatives, (3) investigations, and (4) litigation.

47.     Food safety has been an area of interest for GAP since the organization's founding. In 2009, GAP formed the Food Integrity Campaign ("FIC") to promote accountability within the United States' food system by ensuring the health and welfare of animals, protecting the environment, treating food workers with respect, and keeping the food we eat safe. In order to promote accountability within our food system, FIC provides educational outreach to food industry employees, promotes legislative initiatives, initiates litigation, and provides multimedia resources to promote transparency.

48.     The 2018 Line Speed Increase Decision injures GAP in two ways: (1) the NPIS inspection model dramatically reduces federal whistleblowers, and the 2018 Line Speed Increase Decision will likely cause a significant increase in the number of facilities that opt into NPIS, and (2) the increased line speeds permitted under FSIS's decision undermine the office of the inspector so as to render federal inspection essentially meaningless.

49.     The Whistleblower Protection Enhancement Act of 2012 ("WPEA") is the primary law that gives federal employees the right to report on potentially wrongful conduct free from

reprisal. GAP led a major bipartisan effort to restore whistleblower protection rights to federal employees; this effort was a major reason the WPEA was created and eventually passed.

50.     Since WPEA's passage, GAP has invested significant expense and personnel time in outreach to public sector employees because of the protections federal employees are given under the WPEA. Under the law, federal employees[4] are given the right to disclose information internally and externally. Furthermore, they are protected from retaliation if they: file a complaint or grievance; testify or help another person exercise their rights; cooperate with or disclose information to the Office of Special Counsel, an agency Inspector General, or Congress; or refuse to obey an order that would require the individual to violate a law or regulation.

51.     These protections allow GAP to provide the necessary resources and assistance to public sector whistleblowers. But because private sector employees do not receive the WPEA protections that federal employees do, a shift in duties once held by federal employees to private sector employees would greatly reduce the value of GAP's outreach to public sector employees.

52.     The 2018 Line Speed Increase Decision will undermine the FIC GAP has created, frustrating GAP's mission. GAP, through FIC, relies on brave food industry whistleblowers that come forward with concerns, including federal inspectors in chicken slaughterhouses. However, as more chicken slaughterhouses opt into NPIS (a requirement to obtain a line speed waiver under the 2018 Line Speed Increase Decision), these efforts will be more difficult, and GAP will have to divert resources accordingly.

---

[4] Law enforcement, military and intelligence agencies, U.S. Postal Service employees, Government Accountability Office employees, and federal contractors are exempt from the WPEA provisions.

53.     As a result of FSIS's 2018 Line Speed Increase Decision, the number of facilities participating in NPIS will likely increase. Indeed, there has been a spike in chicken slaughterhouses opting into NPIS since FSIS announced its decision to increase line speeds.

54.     Marketed as "modern," the NPIS model removes federal inspectors from the front lines and replaces them with private sector employees who have few or no whistleblower protections. Because they are not afforded WPEA whistleblower protections, plant employees will be discouraged from reaching out to GAP to make food safety disclosures, and the current aid and resources GAP provides to food industry workers will be severely diminished. In order to compensate for this, GAP will be forced to divert its traditional efforts and instead develop outreach for private (rather than WPEA-protected federal) whistleblowers, which will put a drain on other areas of expenditure.

55.     GAP will also be forced to absorb the costs of revising FIC. FIC was specifically created in 2009 to address the concerns of meat inspection practices. Over the past decade, FIC has helped hundreds of federal food industry whistleblowers make food safety disclosures that averted public health emergencies. However, as more facilities adopt the NPIS inspection model, FIC will be forced to reformulate its program directive to focus on private industry outreach instead of federal outreach. GAP will have no way to rectify this loss, short of restructuring the entire program, cutting staff, and sacrificing other organization initiatives. GAP will be forced to develop new educational and outreach programs because of the different rules and regulations that apply to private-sector inspectors compared with government-employed inspectors.

56.     GAP will also suffer economic injury by losing the substantial income it regularly obtains in its WPEA litigation. Under the WPEA, attorney's fees are awarded for successful whistleblower claims. GAP relies on these anticipated attorney's fees to determine which litigation to take and structure its future financial projections. Since the WPEA's enactment, GAP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

has been awarded more than $2 million in attorney's fees that allow GAP to continue its mission to provide reliable and experienced counsel to whistleblowers in the form of a robust, pro bono litigation team. As more chicken slaughterhouses opt into NPIS, it will force GAP to shift finances to make up for the absent funds, which will divert resources and expenditures from other areas that help whistleblowers.

57.     Additionally, increased slaughter line speeds reduce the ability of the inspectors working in facilities operating at such speeds to see food industry practices that compromise food safety (and therefore such inspectors' ability to blow the whistle on food safety issues). FIC has seven affidavits from current USDA/FSIS employees describing the impossible task of inspecting nearly three birds per second as "a dizzying blur." The increased line speeds force inspectors to work within impossible inspection constraints. There will be no way to keep the food industry honest if the inspectors who are hired to ensure the safety of our food cannot see the food being processed. GAP's efforts to promote accountability through the food industry will be significantly undermined when the individuals it relies on are not able to do the job they are hired to perform. Further, the quality of disclosures of food inspector whistleblowers will decrease, frustrating GAP's mission further and forcing GAP to shift resources to deal with this issue.

58.     Plaintiff MARIN HUMANE ("Marin Humane") is a 501(c)(3) nonprofit organization located and with its principal place of business in Novato, California. Marin Humane was founded more than 100 years ago to protect and advocate for animals. Marin Humane offers refuge, rehabilitation, and support services to more than 10,000 animals each year.

59.     Pursuant to Marin County Ordinances §§ 8.04.110 and 8.04.120, Marin Humane has been appointed as the animal services agency for the county and is authorized to appoint its employees as Animal Services Officers. All Animal Services Officers are deemed to be "peace

Complaint for Declaratory and Injunctive Relief

officers" and are authorized to enforce all animal-related laws of the county and the state of California.

60.     Marin Humane also has an active anticruelty and advocacy program and routinely supports legislation directed at reducing cruelty to all animals. Marin Humane also works with local and state animal control groups, monitoring activity relating to violations of the criminal laws related to animals. Marin Humane monitors and weighs in on national issues and has a special focus on Marin County and its residents. Marin Humane investigates farm animal cruelty complaints, rescues chickens from abusive situations, and monitors chickens moving through Marin on their way to slaughter.

61.     Marin Humane was involved in an extensive investigation of cruelty to broiler chickens, who fell off a truck in Marin, on the way to slaughter. Marin Humane worked with Plaintiff HSUS and other animal welfare groups in this investigation. Marin Humane also increased its monitoring of trucks on the way to slaughter that traveled through Marin County, and considered bringing animal cruelty claims against the transporters and slaughterhouses that received the chickens.

62.     Marin Humane has actively supported the passage of state laws that provide greater protection for all farm animals. Marin Humane promotes and supports a mission of anticruelty for all animals, and for that reason opposes the increased line speeds permitted under the 2018 Line Speed Increase Decision.

63.     Marin Humane has been actively involved in monitoring and investigations of local agricultural businesses, including local custom slaughter facilities.

64.     Marin Humane runs an annual Animal Law Enforcement Academy, an 80-hour, two-week program that teaches students about all aspects of legal issues raised by cruelty to animals (including farm animals) and livestock husbandry. The Academy's teachers also discuss

issues surrounding slaughter. Attendees of the Academy include animal control officers, animal services officers, police officers, humane officers, and other students in the application of state statutes addressing animal cruelty issues.

65.     Marin Humane has had an active humane education program throughout its history, and formulates position statements on the treatment of animals, including chickens, in commercial production.

66.     Because FSIS's 2018 Line Speed Increase Decision will allow more chicken slaughterhouses to operate at accelerated line speeds, Marin Humane will need to divert its resources dedicated to its core programs in order to evaluate and investigate the possibility that chickens who will be subject to increased line speeds will be transported through Marin County.

67.     The ability of Marin Humane to engage in educational, legislative, and advocacy activities with respect to chicken welfare is injured by FSIS's 2018 Line Speed Increase Decision because California slaughterhouses will be entitled to seek FSIS's permission to operate at heightened line speeds—speeds that will increase the number of incidents of animal cruelty throughout the state. Therefore, Marin Humane will respond by increasing its monitoring of trucks loaded with chickens that travel through the County, which is a major entry point to northern cities that may have slaughterhouses.

68.     If Marin Humane had been given the opportunity to comment on the changes in position undertaken by FSIS with respect to chicken slaughterhouse line speeds, it would have joined in with other groups in identifying the problems with increased line speeds, such as those outlined in this Complaint.

69.     Because of FSIS's violation of the APA, Marin Humane has suffered an injury to its statutory right to comment on and oppose federal action which will lead to increased animal cruelty.

70. Because of FSIS's failure to undertake a proper environmental review of the increased line speeds in chicken slaughterhouses throughout California, Defendants have prevented Marin Humane from learning what, if any, environmental effects, including those impacting animals, may result from the increased number of facilities permitted to operate at heightened line speed limits under FSIS's 2018 Line Speed Increase Decision. This failure to comply with NEPA inhibits Marin Humane's efforts to communicate with its supporters, so that they may in turn contact relevant agencies and their elected representatives to advocate for the humane treatment of chickens in slaughterhouses, and the protection of the environment from chicken slaughter contamination.

71. Defendant SONNY PERDUE is sued in his official capacity as USDA Secretary. Mr. Perdue has responsibility for implementing and fulfilling USDA's duties, including the implementation of the PPIA. He bears responsibility, in whole or in part, for the acts complained of in this Complaint.

72. Defendant CARMEN ROTTENBERG is sued in her official capacity as FSIS Administrator, to whom USDA's functions under the PPIA have been delegated. 7 C.F.R. § 2.53(a)(2)(i). Ms. Rottenberg bears responsibility, in whole or in part, for the acts complained of in this Complaint.

73. Defendant U.S. DEPARTMENT OF AGRICULTURE is a federal cabinet department and is legally responsible for the final actions and decisions of the agencies within the USDA.

74. Defendant FOOD SAFETY AND INSPECTION SERVICE is an agency within the USDA.

# STATUTORY BACKGROUND

## I.     <u>Administrative Procedure Act</u>

75.     The APA governs the procedural requirements for federal agency decision-making, including the agency rulemaking process. Before formulating, amending, or repealing a rule, agencies must engage in a notice-and-comment process. 5 U.S.C. §§ 551(5), 553. Notice must include a summary of the public rulemaking proceedings, reference to the legal authority under which the rule is proposed, and "either the terms or substance of the proposed rule or a description of the subjects and issues involved." *Id*. § 553(b). After giving such notice, the agency is required to give interested parties an opportunity to participate in the rulemaking "through submission of written data, views, or arguments." *Id*. § 553(c). The agency must then consider and respond to these comments before promulgating a final rule. *Id*.

76.     The PPIA further requires that when applying the provisions of 5 U.S.C. § 553(c) to proposed rulemaking conducted under the PPIA, "an opportunity for the oral presentation of views shall be accorded all interested persons." 21 U.S.C. § 463(c).

77.     The APA defines "rule" as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency." 5 U.S.C. § 551(4).

78.     The APA provides for judicial review of final agency actions for persons adversely affected or aggrieved by the agency action. *Id.* § 702. Under the APA, a "reviewing court shall . . . hold unlawful and set aside agency action" found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "without observance or procedure required by law."

1

2

*Id*. § 706(2). The APA also gives courts the power to "compel agency action unlawfully withheld

or unreasonably delayed." *Id*. § 706(1).

3

4

5

6

7

8

9

10

11

12

13

79.     If an agency changes a policy or legal interpretation from a previously held

position, the new policy or interpretation is arbitrary and capricious unless the agency provides a

reasoned explanation for why its prior policies and standards are being deliberately changed. *See*

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983).

An agency action is also arbitrary and capricious if "the agency has relied on factors which

Congress has not intended it to consider, entirely failed to consider an important aspect of the

problem, offered an explanation for its decision that runs counter to the evidence before the

agency, or is so implausible that it could not be ascribed to a difference in view or the product of

agency expertise." *Id.* at 43.

14

**II.     Poultry Products Inspection Act**

15

16

17

80.     The purpose of the PPIA, 21 U.S.C. § 451 *et seq*., is to protect "the health and

welfare of consumers . . . by assuring that poultry products distributed to them are wholesome,

not adulterated, and properly marked, labeled, and packaged." 21 U.S.C. § 451.

18

19

20

21

22

23

24

25

26

81.     The PPIA mandates that the "inspection [and regulation] of poultry and poultry

products" is necessary to prevent the sale of "poultry products which are adulterated or

misbranded." *Id.* § 452. A poultry product is "adulterated" if, among other things: (1) "it bears or

contains any poisonous or deleterious substance which may render it injurious to health;" (2) "it

consists in whole or in part of any filthy, putrid, or decomposed substance or is for any other

reason unsound, unhealthful, unwholesome, or otherwise unfit for human food;" or (3) "it is, in

whole or in part, the product of any poultry which has died otherwise than by slaughter." *Id.* §

453(g).

27

28

82.     To prevent commerce in adulterated food, the PPIA requires FSIS inspectors to inspect "the carcass of each bird processed." *Id.* § 455(b). "Inspection" means that the inspector gives a "critical determination whether [a carcass or part of a carcass] is adulterated or unadulterated." *Am. Fed'n of Gov't Employees v. Glickman*, 215 F.3d 7, 11 (D.C. Cir. 2000). Upon such inspection, "[a]ll poultry carcasses and parts thereof and other poultry products found to be adulterated shall be condemned and shall . . . be destroyed for human food purposes under the supervision of an inspector." 21 U.S.C. § 455(c).

83.     Under the PPIA, "[c]arcasses of poultry showing evidence of having died from causes other than slaughter" must be condemned. 9 C.F.R. § 381.90. *See also* 21 U.S.C. §§ 453(g)(5); 455(c). Further, whole carcasses, or parts thereof, must be condemned if they are badly bruised. 9 C.F.R. § 381.89. Additionally, poultry must be "slaughtered in accordance with good commercial practices in a manner that will result in thorough bleeding of the carcasses and ensure that breathing has stopped prior to scalding." *Id.* § 381.65(b). FSIS has further explained that under the PPIA and FSIS's regulations "live poultry *must* be handled in a manner that is consistent with good commercial practices, which means *they should be treated humanely*." Treatment of Live Poultry Before Slaughter, 70 Fed. Reg. 56,624, 56,624 (Sept. 28, 2005) (emphasis added). Birds who die prior to slaughter due to mishandling and birds who are not killed in accordance with good commercial practices are considered adulterated and must be condemned. *Id.* at 56,625; *accord* FSIS, *Directive 6110.1*, *Verification of Poultry Good Commercial Practices* 2 (2018). *See also* 21 U.S.C. § 455(c) (requiring adulterated poultry carcasses, poultry parts, and poultry products to be condemned).

84.     Since at least 2005, FSIS has recognized the relationship between inhumane handling and adulterated poultry products. Specifically, the agency explained that "under the PPIA, poultry products are more likely to be adulterated if . . . they are produced from birds that

have not been treated humanely, because such birds are more likely to be bruised or to die other than by slaughter." Treatment of Live Poultry Before Slaughter, 70 Fed. Reg. at 56,624. FSIS also explained it "considers humane methods of handling animals and humane slaughter operations a high priority and takes seriously any violations of applicable laws and regulations." *Id.*

85.     An FSIS directive regarding poultry slaughter highlights the connection between food safety and humane handling: "In poultry operations, following [good commercial practices], including the employment of humane methods of handling and slaughtering, increases the likelihood of producing unadulterated product. . . . In general, poultry should be handled in a manner that prevents needless injury and suffering in order to produce a commercially marketable product." FSIS, *Directive 6110.1*, *supra*, at 1.

86.     Under current FSIS regulations, as amended in 2014, slaughterhouses opting into NPIS are generally subject to a maximum line speed of 140 bpm. 9 C.F.R. § 381.69(a). The final rule creating NPIS allowed a maximum of 20 facilities to operate at speeds of up to 175 bpm. *See* Modernization of Poultry Slaughter Inspection, 79 Fed. Reg. 49,566, 49,583 (Aug. 21, 2014) [hereinafter "2014 NPIS Final Rule"].

87.     The 2018 Line Speed Increase Decision, challenged in this action, allows an unlimited number of NPIS chicken slaughterhouses to operate at a maximum speed of 175 bpm as long as they meet certain minimal requirements.

88.     An FSIS regulation mandates that slaughterhouses operating under the line speeds authorized by the NPIS comply with all applicable requirements of law. 9 C.F.R. § 381.69(d). These requirements include 29 U.S.C. § 654(a), which requires employers to provide work and workplaces "free from recognized hazards that are causing or are likely to cause death or serious physical harm to [their] employees."

89.     FSIS regulations require all regulated poultry slaughter facilities to monitor their ability to maintain process control, 9 C.F.R. § 381.65(g), and slaughterhouses are "required to maintain process control." 2018 Federal Register Line Speed Notice, 83 Fed. Reg. at 49,058.

90.     Waivers of any PPIA regulations, including the maximum line speed regulation, are only authorized in limited circumstances, and only when each of the following conditions are met: (1) the waiver is for specific classes of cases; (2) the waiver is for limited periods of time; (3) the waiver is necessary to address a public health emergency, or "to permit experimentation so that new procedures, equipment, and processing techniques may be tested to facilitate definite improvements." 9 C.F.R. § 381.3(b). Additionally, granting the waiver cannot conflict with the purposes or provisions of the PPIA. *Id.*

### III.     National Environmental Policy Act

91.     NEPA, 42 U.S.C. § 4331 *et seq.*, is the United States' "national charter for the protection of the environment." 40 C.F.R. § 1500.1. It requires agencies to carefully examine the environmental consequences of their actions. *See* 42 U.S.C. § 4332(2)(C). The statute requires agencies to take a "hard look" at environmental consequences *before* approving any major federal action. *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976).

92.     NEPA and its implementing regulations also require public participation. *See* 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1500.1(b). An agency must make high quality information available to the public before an agency makes its decision and takes action. 40 C.F.R. § 1500.1(b). Accurate scientific analysis and public scrutiny are essential to implementing NEPA. *Id.*

93.     Major federal actions "include[] actions with effects that may be major and which are potentially subject to Federal control and responsibility." *Id.* § 1508.18. Federal actions tend to fall within certain categories, including "[a]doption of official policy, such as rules, regulations,

and interpretations adopted pursuant to the Administrative Procedure Act," "formal documents establishing an agency's policies which will result in or substantially alter agency programs," and "[a]doption of programs, such as a group of concerted actions to implement a specific policy or plan." *Id.* § 1508.18(b).

94.     NEPA establishes three categories for evaluating agency actions. First, agencies must prepare an Environmental Impact Statement ("EIS") for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.4(a)(1).

95.     Second, agencies may "categorically exclude" from NEPA review classes of actions that "do not individually or cumulatively have a significant effect on the human environment." 40 C.F.R. §§ 1508.4, 1501.4(a)(2). But, agencies must "provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect." *Id.* § 1508.4.

96.     Third, agencies must prepare an Environmental Assessment ("EA") for proposed actions that do not fit into either of the first two categories. *Id.* §§ 1501.4(b), 1508.9. If the EA indicates that the proposed action "will not have a significant effect on the human environment," then the agency can issue a Finding of No Significant Impact ("FONSI"). *Id.* §§ 1508.13, 1501.4(e). If, however, the EA indicates that the proposed action may significantly affect the quality of the human environment, the agency must then prepare an EIS. *Id.* § 1501.4(c); *see also* 42 U.S.C. § 4332(2)(C).

97.     The Council on Environmental Quality ("CEQ") has promulgated regulations implementing NEPA that are "binding on all Federal agencies." 40 C.F.R. § 1500.3. These regulations instruct that whether an action will have a "significant" impact on the environment— thus warranting the preparation of an EIS—requires considerations of "context" (effects at the

national, regional, and local levels) and "intensity" (the severity of the impact). *Id.* § 1508.27. The agency cannot avoid significance by dividing a proposed project into small component parts. *Id.* § 1508.27(b)(7).

98.     Under NEPA, an agency must "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E). CEQ's regulations require that agencies "[r]igorously explore and objectively evaluate all reasonable alternatives" to the proposed action when preparing an EIS. 40 C.F.R. § 1502.14(a); *see also* 42 U.S.C. § 4332(2)(C)(iii). The alternatives section is "the heart" of the EIS. 40 C.F.R. § 1502.14. CEQ also requires that EAs weigh available alternatives. *See id.* § 1508.9(b).

99.     USDA regulations categorically exclude all actions of certain agencies, including FSIS, from preparation of an EA or EIS, but this exemption does not apply if the agency head determines an action may have a significant environmental effect. 7 C.F.R. § 1b.4.

## FACTUAL BACKGROUND

### I.     <u>Summary</u>

100.     Even when operating at a maximum line speed of 140 bpm, chicken slaughterhouses cause serious harm to animals, the environment, and workers. Allowing and strongly encouraging such slaughterhouses to operate at higher speeds will exacerbate these problems.

101.     Despite the agency's acknowledgment that animal welfare and worker safety risks already exist in chicken slaughterhouses, FSIS's 2018 Line Speed Increase Decision—challenged in this Complaint—entitles chicken slaughterhouses operating pursuant to the New Poultry Inspection System ("NPIS") to operate at speeds of up to 175 bpm so long as they meet certain

minimal requirements. (NPIS is an optional federal inspection system for poultry slaughterhouses.)

102.   FSIS issued the 2018 Line Speed Increase Decision even though the agency considered, but ultimately rejected, increasing chicken slaughter line speed maximums to 175 bpm during the 2012 to 2014 rulemaking process that created the NPIS. After receiving numerous comments criticizing its proposal, the agency instead set the maximum line speed for NPIS chicken slaughterhouses at 140 bpm in a 2014 final rule. The final rule provided a narrow exception allowing no more than 20 chicken slaughter facilities to operate at speeds of up to 175 bpm.

103.   The 2018 Line Speed Increase Decision amends that 2014 final rule. Since FSIS issued the 2018 Line Speed Increase Decision, the number of chicken slaughterhouses permitted to operate at speeds of up to 175 bpm has nearly doubled. And, because the Decision sets no limit on the number of slaughterhouses that can operate at speeds of up to 175 bpm, it clears the way for dozens more chicken slaughterhouses to operate at that speed, effectively creating a new maximum line speed for NPIS chicken slaughterhouses.

**II.   Detrimental Impacts of High Slaughter Line Speeds**

**A.  *High Line Speeds Threaten Animal Welfare and Food Safety***

104.   Animal welfare is significantly compromised as slaughter line speeds increase. Yet, through its 2018 Line Speed Increase Decision, FSIS is allowing facilities to increase their line speeds even though the agency has long understood that the inhumane treatment of birds at slaughterhouses undermines food safety.

1.  Inhumane Treatment of Chickens During Slaughter

105.   Roughly nine billion chickens are killed for their meat in the United States each year. These birds are often called "broilers" or "broiler chickens." Most broiler chickens are raised

on "factory farms," where chickens—who have been bred to grow at an unnaturally fast rate—are crowded into barren warehouses.

106.    These chickens reach slaughter weight approximately six weeks after they hatch. They are then violently caught by the legs and shoved into tightly packed cages to be transported to slaughter. Their journey is fundamentally cruel. The crowded birds suffer from bruises and injuries inflicted during catching, food and water deprivation, and potential temperature extremes. Birds frequently die on their way to slaughter.

107.    The birds who survive transport are then slaughtered while hanging upside down, shackled by their legs, on a constantly moving conveyor line—where the goal is killing the maximum number of animals in the shortest amount of time, with little regard for animal welfare. This causes a regular pattern of innumerable cruelties to the birds.

108.    When the transport trucks carrying chickens arrive at slaughter facilities, cages are moved from the trucks to a slaughter line where workers are supposed to segregate the birds who have died during transport from live birds. Workers grab live, and fully conscious, chickens by their legs and shackle them upside down on the overhead line for conveyance through the facility. High line speeds and production demands result in the inhumane handling of birds as they are hung on the line, including birds being roughly handled by workers trying to keep up with the high speed of the line and birds being improperly shackled by one leg.

109.    Once shackled, the mechanized line is supposed to drag each chicken through an electrified vat of water called a "stun bath." If birds actually effectively enter the bath, it is supposed to provide an electrical shock that will stun and immobilize the animals before they are killed. Effective stunning minimizes the distress and suffering chickens experience during the slaughter process because it renders the animals unconscious for the duration of that process.

Complaint for Declaratory and Injunctive Relief

110.    However, there are numerous problems with the stunning process in the United States, resulting in chickens who are not actually or adequately stunned. So rather than being unconscious during the subsequent killing and processing phases, many birds are fully conscious for some, or all, of the remaining slaughter process.

111.    After stunning is attempted, chickens' carotid arteries are supposed to be cut by an automated "killing blade." Effective carotid cutting is required to ensure the birds die from exsanguination as required by FSIS regulations. *See* 9 C.F.R. § 381.65(b).

112.    However, many birds remain fully conscious and mobile when they reach the automated kill knife and are able to avoid the blade. Because birds escape the kill knife frequently, chicken slaughterhouses employ a "back-up killer"—who is watching as many as 140 birds per minute pass by, and who stands at the point on the line where the chickens emerge after the kill blade and, if possible, identifies live birds and manually cuts the necks of birds who have not been properly killed.

113.    After the kill blade phase of slaughter, chickens proceed down the line to the "scalder," a tank of hot water intended solely for use on dead, exsanguinated birds. (The scalding water loosens feathers from carcasses.) Because chickens regularly miss the electrified water of the stun bath or are not sufficiently stunned, and because those birds may also miss the killing blade, many chickens enter the scald tank fully conscious and die in scalding hot water.

114.    The agency is aware that chickens regularly enter the scalder while still alive, and then die in scalding water. As FSIS explains, "[t]he evidence of bright red cadaver birds means that the birds . . . were breathing prior to entering the scald vat." FSIS, *Poultry Postmortem Inspection* 6 (2014). The term "red birds" is used for birds who die in this manner.

115.   The manner in which these "red birds" die violates FSIS regulations, which require that slaughter "result in thorough bleeding of the carcasses and ensure that breathing has stopped prior to scalding." *See* 9 C.F.R. § 381.65(b).

2.   Adverse Impacts of Higher Slaughter Line Speeds on Chicken Welfare

116.   The animal welfare problems in the slaughter process are further exacerbated by the high speed of the mechanized slaughter line. And, as FSIS has long recognized, these problems threaten food safety: "[P]oultry products are more likely to be adulterated if, among other circumstances, they are produced from birds that have not been treated humanely, because such birds are more likely to be bruised or to die other than by slaughter." Treatment of Live Poultry Before Slaughter, 70 Fed. Reg. at 56,624.

117.   FSIS recently increased slaughter line speed maximums through its 2018 Line Speed Increase Decision, allowing chicken slaughterhouses to operate their lines at speeds of up to 175 bpm if they meet certain minimal requirements.

118.   Undercover investigations and FSIS's own records demonstrate that many of the animal welfare problems identified in this Complaint were observed in poultry slaughterhouses before FSIS issued its 2018 Line Speed Increase Decision.

119.   Allowing more chicken slaughterhouses to operate their lines at speeds of up to 175 bpm will exacerbate the inhumane nature of chicken slaughter and will increase the risk of loss of process control.

120.   Faster shackling at this increased speed may lead to less care in the handling of live birds and increased instances of bruising or broken and dislocated bones. Accelerated line speeds may also increase the risk that birds are improperly stunned, which could result in their throats not being properly cut. Higher line speeds also impede opportunities to observe and correct instances where birds miss the kill blade and continue to the scalder still alive.

121.    Increased line speeds will make it more difficult for inspectors to examine the carcass of each bird as required by the PPIA. This problem will be made worse because the NPIS model, in which slaughter facilities operating at higher speeds must participate, allows slaughterhouses to reduce the number of FSIS inspectors along the slaughter line.

122.    Many animal welfare and food safety risks have been documented in at least one facility allowed to operate at speeds of up to 175 bpm. In 2018, Plaintiff Animal Outlook's ("AO") undercover investigator worked at Amick Farms in Hurlock, Maryland. The facility is permitted to operate at speeds of up to 175 bpm, and the investigator documented numerous examples of inhumane handling of chickens.

123.    For example, during the live-hanging process, the investigator documented frequent physical mistreatment of birds, including workers improperly grasping chickens by their wings or heads and injuring chickens by unnecessarily pressing them against the moving conveyor belt.

124.    The investigator also witnessed the hanging of dead birds in shackles (meaning they would continue to be processed for human consumption). On one occasion, a supervisor instructed workers to hang a group of chickens of whom approximately 95 percent were dead. These birds had visible injuries, such as blood spots, dangling wings, and broken legs, and were stiff to the touch when hung.

125.    In addition, the investigator frequently saw live birds hung on the line even though they appeared adulterated in various ways (such as having green skin that leaked pus or by being coated with a black, oily substance that resembled tar).

126.    The investigator documented consistent, daily line breakdowns at Amick Farms. During these breakdowns, the line was stopped for lengths of time ranging from several minutes to more than an hour. The investigator documented chickens who were trapped in the stun bath

during this time. Their heads remained underwater for the entirety of the breakdown, and they undoubtedly either drowned or died from electrocution in the stun bath while the slaughter line stalled. During a comparable investigation at a facility operating at line speeds of up to 140 bpm, AO investigators have not observed these sorts of breakdowns, indicating these breakdowns may have been the result of Amick Farms' operation at higher line speeds.

127.    The investigator also documented "red birds," an indication that these birds entered the vat of scalding hot water while alive.

128.    As evidenced by Plaintiff AO's investigation, more chickens at facilities operating at speeds of up to 175 bpm will be subjected to mishandling as they are shackled on the slaughter line by workers attempting to keep up with the faster line speed. Further, more birds will be drowned alive in scalding hot water after they are ineffectively stunned and/or miss the kill blade and are not caught by backup personnel. And as mechanical problems shut down overwhelmed slaughter lines, birds may drown in the stun bath as well.

129.    There are alternatives to FSIS's 2018 Line Speed Increase Decision of which the agency is aware. For example, FSIS could have conditioned line speed increases on a slaughterhouse's adoption of multi-stage controlled atmospheric stunning or killing. In this system, birds are stunned or killed in an enclosed chamber before they are shackled, so adoption of this system could have several advantages over the electrical stun bath system and could help to maintain process control.

**B.  *High Line Speeds Jeopardize Worker Safety***

130.    Workers in the poultry industry face numerous hazards, including high noise levels, dangerous equipment, the threat of musculoskeletal disorders, and toxic chemicals.

131.    A 2016 Government Accountability Office report found that injury rates in the meat and poultry slaughter industries remain higher than the rates for the manufacturing industry

overall. The incidence rate of occupational illnesses for the poultry industry is more than six times the average for all U.S. industries. And the serious injury rate for poultry workers—injuries that require time off or restricted activity to recuperate—is almost double that of private industry.

132.    Musculoskeletal disorders are common among poultry processing workers. For example, the incidence rate of carpal tunnel syndrome among poultry processing workers was more than seven times the national average in 2013.

133.    Poultry workers are also at high risk of very serious injuries, such as amputations.

134.    These worker safety problems are so well documented that, under the PPIA, FSIS has promulgated regulations aimed at protecting workers in poultry slaughterhouses (though these regulations have failed dismally).

135.    The problems just described have occurred in large numbers at the already too-high line speed maximum of 140 bpm. There will be a direct correlation between an increase in line speeds and an increase in these types of injuries.

136.    There have been reports of at least two recent employee deaths at chicken slaughterhouses operating at increased line speeds.

137.    The 2018 Line Speed Increase Decision thus further threatens worker safety because workers in slaughterhouses operating at faster line speeds will be at increased risk of injury as they are forced to keep up with these faster slaughter lines.

138.    Plaintiff AO's undercover investigator experienced injuries and health problems when he worked at Amick Farms in Hurlock, Maryland (a facility allowed to operate at line speeds of up to 175 bpm). The investigator worked on the slaughter line, hanging birds in shackles on the mechanized conveyor line.

139.    Within a week of starting at Amick Farms, the investigator suffered swollen knuckles so severe that he could not make a fist. He was told by his supervisor and Amick Farms'

medical staff that his pain and injuries were routine and that his body would adjust. He continued having these issues and was ultimately forced to seek outside medical care and to take several days off to recover from his injuries. When the investigator took this time off, Amick Farms attempted to fire him. He was not allowed to return to work unless he signed a document stating that his injury was not related to his work at Amick Farms. Several months later, he continued to experience pain in his hands.

140. The investigator also became ill from inhaling ammonia, emitted from the chickens' waste, at the plant. The investigator experienced eye, nose, and throat irritation that intensified both during the course of the workday and during the course of his employment at the plant. Initially, the investigator did not notice residual effects from ammonia exposure, but by his third week of employment at the slaughterhouse, he developed a regular cough and, at night, experienced cold sweats and fevers (one as high as 104.6 degrees).

141. Accelerated line speeds will increase and intensify the concentration of ammonia to which poultry line workers are exposed. More birds are being processed on the line in the same amount of time, which means more urine and feces and more waste byproducts, including ammonia. Further, increased line speeds lead to more rough handling of birds, likely resulting in even more waste being released both because the birds experience extreme stress, and because they are squeezed more as they are shackled to the slaughter line.

142. AO's investigator also developed rashes on his skin; they typically formed on areas of skin that had the most exposure to the slaughterhouse environment. By the time the investigator completed his investigation, he had rashes on his face, arms, wrists, and neck. He observed numerous other employees who had similar rashes.

Complaint for Declaratory and Injunctive Relief

### C. *High Line Speeds Harm the Environment*

143. The production of chickens causes environmental harm. The raising of chickens used for food produces waste, consumes water, and requires the use of fossil fuels to transport animals from the confined feeding operations where they are raised to the slaughterhouses where they are killed.

144. The slaughter of chickens also causes environmental harm. Studies from the U.S. Environmental Protection Agency ("EPA") have detected pollutants in the untreated wastewater of poultry processing facilities "at treatable levels in at least 10 percent of all the [untreated] wastewater samples." EPA, *EPA-821-R-04-011*, *Technical Development Document for the Final Effluent Limitations Guidelines and Standards for the Meat and Poultry Products Point Source Category (40 C.F.R. 432)* 7-17 to -19 (2004) ("treatable levels" were set "at five times the baseline value").

145. Additionally, an EPA study of 88 chicken processing facilities found a mean value of more than nine gallons of wastewater generated per bird—more wastewater per live-weight pound than other types of meat processing. *Id.* at 6-7 to -8.

146. The EPA recognizes that poultry slaughter wastewater may contain "pathogens of enteric origin, such as *Salmonella sp.* and *Campylobacter jejuni*, gastrointestinal parasites, and pathogenic enteric viruses." *Id.* at 6-11.

147. The wastewater from chicken slaughterhouses is frequently discharged into waterways, and many slaughterhouses fail to comply with terms of their Clean Water Act permits for such discharges.

148. Further, USDA is aware that poultry slaughter is an immense drain on water supplies.

149. These environmental harms are worsened as more chickens are produced and slaughtered.

150. A slaughterhouse that increases its line speed is able to kill more birds in the same amount of time. For example, a single facility that increases the speed of just one of its lines from 140 bpm to 175 bpm and continues to operate that line for 40 hours a week would be able to kill an additional 84,000 chickens each week and more than 4.3 million additional chickens in a year.

151. To meet such a slaughterhouse's increased production levels, chickens would either have to be transported from additional production facilities that are farther away—thereby increasing pollution from transit—or nearby contract growers would have to expand their operations to produce more birds. By producing more birds, those growers would create more waste, use more water, and burn more fossil fuels while transporting animals from the farms to the slaughterhouse.

152. The process of slaughtering more birds would also cause additional environmental harm. Killing more birds will generate more wastewater, which threatens water quality at the local, state, and/or national level. In addition, slaughtering more birds would require more water, and thus would put an additional strain on water supplies.

153. Alternatives to FSIS's 2018 Line Speed Increase Decision exist, and FSIS is aware of these alternatives. For example, FSIS could have conditioned line speed increases on a slaughterhouse's adoption of multi-stage controlled atmospheric stunning or killing. The amount of water used in the stunning process is reduced in slaughterhouses that use this system because birds are killed or stunned using gas. The electrical stun bath is not used to stun birds, so the stunning process requires less water.

Complaint for Declaratory and Injunctive Relief

III. **Procedural History: FSIS's Regulation of Line Speed Maximums at Chicken Slaughterhouses**

A. *FSIS's 2014 New Poultry Inspection System Rulemaking and Decision Not to Increase Line Speeds*

154.    In 2014, FSIS issued the 2014 NPIS Final Rule, creating the NPIS for young chicken and turkey establishments; such establishments could elect to operate under this system or continue to operate under existing inspection systems. 79 Fed. Reg. at 49,566.

155.    The 2012 proposed rule would have allowed NPIS chicken slaughterhouses to increase line speeds to a maximum of 175 bpm. Modernization of Poultry Slaughter Inspection, 77 Fed. Reg. 4,408, 4,423 (Jan. 27, 2012) [hereinafter "2012 NPIS Proposed Rule"].

156.    In response to its proposal to increase line speeds, FSIS received "the most comments on" the detrimental impacts accelerated line speeds would have on slaughterhouse worker safety. 2014 NPIS Final Rule, 79 Fed. Reg. at 49,591. FSIS also received more than a thousand comments highlighting how increased line speeds would be harmful to animal welfare. *Id.* at 49,609-10.

157.    In March 2014, a few months before the NPIS rule was finalized, 68 members of the U.S. House of Representatives sent a letter to the USDA Secretary that, among other things, raised concerns about the impact the 175 bpm line speed maximum would have on worker safety along with the impact it would have on animal welfare and, in turn, food safety.

158.    In the subsequent 2014 NPIS Final Rule, FSIS declined to implement the proposed line speed maximum of 175 bpm. Instead, the final rule prohibited most NPIS chicken slaughterhouses from operating above 140 bpm. *Id.* at 49,591.

Complaint for Declaratory and Injunctive Relief

159.    An exception was granted to the 20 former participants in the HACCP-Based Inspection Models Project[5] ("HIMP"). While participating in the HIMP pilot, these facilities were allowed to operate at line speeds of up to 175 bpm.

160.    In the 2014 NPIS Final Rule, FSIS explained that former HIMP chicken slaughterhouses would be permitted to continue to operate at up to 175 bpm under a waiver. *Id.* at 49,583. FSIS also explained that if one of those facilities went out of business or decided to give up its waiver, the agency would select another establishment to operate at higher line speeds but that, at a maximum, 20 chicken slaughterhouses would be permitted to operate at a maximum speed of 175 bpm. *Id.*

161.    During the NPIS rulemaking, FSIS considered the impact increased line speeds would have on worker safety. In the 2012 NPIS Proposed Rule, FSIS "recognize[d] that evaluation of the effects of line speed on food safety should include the effects of line speed on establishment employee safety." 77 Fed. Reg. at 4,423.

162.    Accordingly, the agency asked the National Institute of Occupational Safety and Health to evaluate the impacts of increased line speeds on worker safety. *Id.* at 4,423-24. The agency also "requeste[d] specific comments on the effects of increased line speeds and production volume on worker safety." Proposed Rule; Extension of Comment Period, 77 Fed. Reg. 24,873, 24,877 (Apr. 26, 2012).

---

[5] HACCP refers to the Hazard Analysis and Critical Control Point program, which is a USDA system "whereby meat and poultry establishments can identify and evaluate the food safety hazards that can affect the safety of their products, institute controls necessary to prevent those hazards from occurring or keeping them within acceptable limits, monitor the performance of controls, and maintain records routinely." Pathogen Reduction; Hazard Analysis and Critical Control Point (HACCP) Systems, 61 Fed. Reg. 38,806, 38,814 (July 25, 1996).

163.    The 2014 NPIS Final Rule included two regulations related to worker safety. The agency relied on the PPIA when it promulgated the substance of this final rule. 79 Fed. Reg. at 49,633.

**B.** ***FSIS's 2018 Line Speed Increase Decision Without Notice-and-Comment Rulemaking***

164.    In September 2017, the National Chicken Council ("NCC") petitioned FSIS, asking the agency to create a waiver system that would allow slaughterhouses participating in NPIS to receive waivers to operate without any restrictions on line speeds if they met certain requirements. *See generally* NCC, Petition to Permit Waivers of the Maximum Line Speed Rates for Young Chicken Slaughter Establishments under the New Poultry Inspection System and *Salmonella* Initiative Program (Sept. 1, 2017) (hereinafter "NCC Petition").

165.    In January 2018, FSIS denied the NCC Petition. However, in the denial letter, the agency explained that it would set out so-called "criteria" for granting line speed waivers, which would allow facilities to operate at line speeds of up to 175 bpm. Letter from Carmen Rottenberg, Acting Deputy Under Sec'y, Office of Food Safety, USDA, to Michael Brown, President, NCC (Jan. 29, 2018).

166.    Because FSIS did not issue a proposed rule after it received the NCC Petition, the public was never able to comment on the agency's 2018 Line Speed Increase Decision nor FSIS's purported factual or legal basis for this decision.

167.    In a February 23, 2018 FSIS Constituent Update, FSIS set out requirements the agency would apply in granting or denying applications for waivers of the maximum line speed of 140 bpm. Chicken slaughterhouses holding such waivers would be permitted to operate at speeds of up to 175 bpm. Constituent Update, *supra*, at 1-2.

168.   The 2018 Federal Register Line Speed Notice reiterated the requirements for line speed waivers set out in the Constituent Update and added a limited number of additional requirements. 2018 Federal Register Line Speed Notice, 83 Fed. Reg. at 49,050.

169.   Among the requirements to receive a line speed waiver, a slaughterhouse "[m]ust be able to demonstrate that the new equipment, technologies, or procedures that allow the establishment to operate at faster line speeds will maintain or improve food safety." *Id.*; Constituent Update, *supra*, at 1.

170.   Relatedly, a slaughterhouse applying for a line speed waiver must "[d]escribe[] how existing or new equipment, technologies, or procedures will allow for the operation at a faster line speed" and "support[] how the modifications to its food safety system to operate at the faster line speed will maintain or improve food safety." 2018 Federal Register Line Speed Notice, 83 Fed. Reg. at 49,050; Constituent Update, *supra*, at 2.

171.   The agency claimed it intends to use data collected from the chicken slaughterhouses granted line speed waivers to assess such facilities' ability to maintain process control at higher slaughter speeds and to inform future rulemaking. 2018 Federal Register Line Speed Notice, 83 Fed. Reg. at 49,052. The agency provided no timeline for when it would conduct such rulemaking. *Id.*

172.   The agency also stated its intention to issue former HIMP establishments, which already held waivers to operate at speeds of up to 175 bpm, "new waiver letters" containing the requirements identified in the 2018 Federal Register Line Speed Notice. *Id.* If these former HIMP facilities failed to meet any of the requirements, FSIS could revoke their line speed waivers. *Id.*

173.   FSIS revoked the waiver of at least one former HIMP facility for its failure to comply with the requirements outlined in the 2018 Federal Register Line Speed Notice.

174.    The agency subsequently issued that former HIMP facility a new line speed waiver several months after the revocation.

175.    The 2018 Line Speed Increase Decision requires waiver recipients to consistently operate at least one line at a speed of more than 140 bpm to retain their waiver. *Id.* at 49,051; Constituent Update, *supra*, at 2. This is a new requirement for line speed waivers, and it effectively forces facilities to operate at heightened speeds.

176.    The 2018 Line Speed Increase Decision changes the maximum line speed at which NPIS facilities can operate. So long as an NPIS chicken slaughterhouse meets certain minimal requirements, FSIS will permit it to operate at line speeds of up to 175 bpm.

177.    The 2018 Line Speed Increase Decision changes the number of chicken slaughterhouses that can operate at a maximum speed of 175 bpm. In the 2014 NPIS Final Rule, the agency made clear that no more than 20 chicken slaughterhouses could operate at that speed, but the 2018 Line Speed Increase Decision places no limit on the number of waivers that FSIS can issue—meaning that under the Decision, an unlimited number of NPIS chicken slaughterhouses can operate at speeds of up to 175 bpm.

178.    FSIS did not engage in APA rulemaking before issuing the 2018 Line Speed Increase Decision. Before increasing NPIS chicken slaughterhouse line speed maximums through the Decision, FSIS did not publish in the Federal Register a notice of proposed rulemaking for the Decision; did not reference the legal authority under which it was issuing the Decision; did not provide the public with an opportunity to submit written or oral comments on a proposed rule; did not publish a final rule in the Federal Register for the Decision; and did not set an effective date for the Decision at least 30 days after publication of a final rule in the Federal Register.

179.    Beginning in 2018, FSIS conducted rulemaking to eliminate line speed limits in pig slaughterhouses. Modernization of Swine Slaughter Inspection, 83 Fed. Reg. 4,780, 4,795-96

(Feb. 1, 2018). And in 2012, the agency proposed (but ultimately rejected) increasing line speed limits at chicken slaughterhouses through rulemaking. 2012 NPIS Proposed Rule, 77 Fed. Reg. at 4,423.

180.     Because FSIS did not conduct notice-and-comment rulemaking before issuing the 2018 Line Speed Increase Decision, Plaintiffs did not have the opportunity to review the agency's proposed action, to provide input and comments on that action, or to engage in their right to exhaust administrative remedies under the APA.

181.     After it was already in effect, FSIS provided its purported legal basis for the 2018 Line Speed Increase Decision in the 2018 Federal Register Line Speed Notice.

182.     The agency claims to have addressed animal welfare concerns by adding a new criterion in the 2018 Federal Register Line Speed Notice, one not included in the Constituent Update. Under this new criterion, to be eligible for a waiver, a facility must not have received a non-compliance record ("NR") for violation of good commercial practices ("GCP") in the past 120 days. 2018 Federal Register Line Speed Notice, 83 Fed. Reg. at 49,050.

183.     Under FSIS's current enforcement practices, NRs for GCP violations only document a subset of the instances of inhumane handling that FSIS officials have identified in chicken slaughterhouses.

184.     Although FSIS identifies other circumstances under which line speed waivers issued through the 2018 Line Speed Increase Decision can be revoked, FSIS does not require waiver revocation if birds are treated inhumanely after a facility is permitted to operate at higher line speeds under such a waiver.

185.     In issuing the 2018 Line Speed Increase Decision, the agency did not consider the impact the Decision would have on slaughterhouse worker safety. Although acknowledging "that working conditions in poultry slaughter establishments is an important issue," FSIS avoided

addressing this issue by claiming—in direct conflict with its prior position—that the agency "has neither the authority nor expertise to regulate issues related to establishment worker safety." *Id.* at 49,057.

### C. *Impacts of FSIS's 2018 Line Speed Increase Decision*

186.    FSIS has placed no limit on the number of chicken slaughterhouses that can receive waivers to operate at increased line speeds under the 2018 Line Speed Increase Decision.

187.    As of the date of this filing, FSIS allows at least 37 chicken slaughterhouses to kill birds at speeds above 140 bpm. Salmonella *Initiative Program (SIP) Participants Table* (Jan. 14, 2020)                    https://www.fsis.usda.gov/wps/wcm/connect/188bf583-45c9-4837-9205-37e0eb1ba243/Waiver_Table.pdf?MOD=AJPERES. Of these 37 slaughterhouses, 19 are former HIMP participants. *Id.* On knowledge and belief, in 2019, FSIS issued these 19 former HIMP facilities new waiver letters to operate at speeds of up to 175 bpm under the 2018 Line Speed Increase Decision. Since October 2018, FSIS has issued at least 18 line speed waivers to chicken slaughterhouses previously limited to operating at 140 bpm. *Id.* On knowledge and belief, these 18 slaughterhouses received waivers to operate at speeds of up to 175 bpm under the 2018 Line Speed Increase Decision.

188.    In order to operate at increased line speeds under the 2018 Line Speed Increase Decision, a chicken slaughterhouse must have operated under NPIS for at least a year. 2018 Federal Register Line Speed Notice, 83 Fed. Reg. at 49,050; Constituent Update, *supra*, at 1.

189.    Both NCC and a high-ranking official at USDA's Office of Food Safety have indicated that allowing facilities to operate at speeds above the 2014 NPIS Final Rule's maximum line speed of 140 bpm could incentivize slaughterhouses to convert to NPIS.

190.    The table below details the number of chicken slaughterhouses that have converted to NPIS (as of June 2019) since the 2014 NPIS Final Rule was issued:

Complaint for Declaratory and Injunctive Relief

| Year | Number of Chicken Slaughterhouses Converting to NPIS |
|---|---|
| 2015 | 23 |
| 2016 | 14 |
| 2017 | 12 |
| 2018 (FSIS announced plans for the 2018 Line Speed Increase Decision in January 2018) | 36 |
| 2019 (as of June 17) | 13 |
| Total | 98 |

191.    There has been a steep increase in the NPIS conversion rate for chicken slaughterhouses since FSIS's January 2018 announcement that the agency would allow chicken slaughterhouses participating in NPIS to seek waivers to increase their line speed maximums to 175 bpm.

192.    In the eighteen-month period immediately following FSIS's January 2018 announcement, 49 facilities converted to NPIS—the exact same number that converted during the *first three years* of NPIS's existence. More chicken slaughterhouses converted to NPIS in 2018 than in 2015 (the first year of NPIS conversions). More chicken slaughterhouses converted to NPIS in the first half of 2019 than in all of 2017.

193.    Because the 2018 Line Speed Increase Decision requires facilities to operate under NPIS for at least a year before seeking a waiver, it is likely that more chicken slaughterhouses will seek line speed waivers as they become eligible to do so—especially in light of the dramatic increase in NPIS conversions following FSIS's announcement of its decision to increase line speeds.

194.    If Plaintiffs are successful in this suit and this Court vacates the 2018 Line Speed Increase Decision and the waivers issued under it, both former HIMP slaughterhouses and non-former HIMP slaughterhouses with line speed waivers issued under the Decision will be required

Complaint for Declaratory and Injunctive Relief

to operate at a speed of no more than 140 bpm—the maximum NPIS line speed permitted by PPIA regulations. *See* 9 C.F.R. § 381.69(a).

195. FSIS did not prepare an EIS or EA and FONSI to evaluate the potential environmental impacts of the 2018 Line Speed Increase Decision.

196. As many as 187 chicken slaughterhouses were expected to opt into NPIS. 2014 NPIS Final Rule, 79 Fed. Reg. at 49,617. When some of those facilities obtain line speed waivers to operate at up to 175 bpm under the 2018 Line Speed Increase Decision and those facilities begin killing more chickens, freshwater will be threatened by increased pollution and depletion. Further, to meet these facilities' increased production levels, chickens would have to be transported greater distances or nearby growers would have to raise more chickens, either of which threatens the environment.

197. The agency claimed its 2018 Line Speed Increase Decision is categorically excluded from NEPA under 7 C.F.R. § 1b.4. 2018 Federal Register Line Speed Notice, 83 Fed. Reg. at 49,058. Under that regulation, FSIS actions are categorically excluded "unless the agency head determines that an action may have a significant environmental effect." 7 C.F.R. § 1b.4.

198. The agency claimed it "did not anticipate" that its decision to increase line speeds would have individual or cumulative effects on the environment because "[e]xpected sales of poultry products to consumers will determine the total number of birds that a poultry establishment slaughters, not the maximum line speed under which it operates." 2018 Federal Register Line Speed Notice, 83 Fed. Reg. at 49,058.

## CLAIMS FOR RELIEF

### Claim One: FSIS's 2018 Line Speed Increase Decision Violated the APA Because It Does Not Comply with FSIS's Regulation Setting the Requirements for Regulatory Waivers

199. The allegations set forth above are incorporated by reference.

200.     FSIS has promulgated a specific regulation that governs the limited circumstance in which waivers of its poultry products inspection regulations can be granted. FSIS's waiver regulation allows the agency to waive compliance with poultry inspection regulations only "for limited periods," and "in specific classes of cases . . . to permit experimentation so that new procedures, equipment, and processing techniques may be tested to facilitate definite improvements." 9 C.F.R. § 381.3(b).

201.     The 2018 Line Speed Increase Decision does not require FSIS to place an end date on the waivers it issues. Therefore, the Decision allows FSIS to issue waivers that are not for limited periods.

202.     The 2018 Line Speed Increase Decision places no limit on the number of slaughterhouses that can operate at a maximum speed of 175 bpm. Therefore, the Decision allows FSIS to issue waivers that are not limited to specific classes of cases.

203.     To obtain a line speed waiver under the 2018 Line Speed Increase Decision, a slaughterhouse must only "be able to demonstrate that the new equipment, technologies, or procedures that allow the establishment to operate at faster line speeds will *maintain* or improve food safety." 2018 Federal Register Line Speed Notice, 83 Fed. Reg. at 49,050; Constituent Update, *supra*, at 1 (emphasis added). Therefore, the Decision allows FSIS to issue waivers for reasons other than testing to "facilitate definite improvements."

204.     To obtain a line speed waiver under the 2018 Line Speed Increase Decision, a slaughterhouse must "[d]escribe[] how *existing* or new equipment, technologies, *or* procedures will allow for the operation at a faster line speed." 2018 Federal Register Line Speed Notice, 83 Fed. Reg. at 49,050; Constituent Update, *supra*, at 2 (emphasis added). Therefore, the Decision allows FSIS to issue waivers that do not involve experimentation to test new procedures, equipment, and processing techniques.

Complaint for Declaratory and Injunctive Relief

205.    The 2018 Line Speed Increase Decisions constitutes final agency action that affects the legal rights and duties of third parties and has the force and effect of law.

206.    The 2018 Line Speed Increase Decision violates FSIS's regulation governing regulatory waivers because it permits the agency to issue waivers that do not satisfy one or more of the required conditions for waivers set out in 9 C.F.R. § 381.3(b).

207.    Accordingly, FSIS's 2018 Line Speed Increase Decision constituted an agency action that was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" in violation of the APA, 5 U.S.C. § 706(2)(A).

### Claim Two: FSIS Violated the APA by Amending Existing Regulations Without Complying with Mandatory Rulemaking Procedures

208.    The allegations set forth above are incorporated by reference.

209.    Under current FSIS regulations, NPIS young chicken slaughterhouses are prohibited from operating above 140 bpm. 9 C.F.R. § 381.69(a).

210.    The 2018 Line Speed Increase Decision amends 9 C.F.R. § 381.69(a) by allowing an unlimited number of NPIS chicken slaughterhouses to operate at speeds above 140 bpm, and up to 175 bpm, if they meet certain minimal requirements. By effecting that amendment, the 2018 Line Speed Increase Decision therefore changes the maximum line speed for NPIS young chicken slaughterhouses.

211.    FSIS's waiver regulation allows the agency to waive compliance with poultry inspection regulations only "for limited periods," and "in specific classes of cases . . . to permit experimentation so that new procedures, equipment, and processing techniques may be tested to facilitate definite improvements." *Id.* § 381.3(b).

212.    The 2018 Line Speed Increase Decision effectively amends 9 C.F.R. § 381.3(b) because it allows FSIS to issue waivers that do not comply with 9 C.F.R. § 381.3(b)'s

requirements and instead creates different requirements that NPIS chicken slaughterhouses must meet to obtain waivers of 9 C.F.R. § 381.69(a)'s maximum line speed of 140 bpm.

213.    FSIS failed to comply with procedural rulemaking requirements of the APA when issuing its 2018 Line Speed Increase Decision, which amends one or more existing FSIS regulations. *See* 5 U.S.C. § 553.

214.    When issuing the 2018 Line Speed Increase Decision, FSIS also failed to comply with the PPIA's procedural requirement that interested persons be accorded an opportunity for oral presentation of views when APA § 553(c) rulemaking is conducted under the PPIA. *See* 21 U.S.C. § 463(c).

215.    Accordingly, FSIS's issuance of the 2018 Line Speed Increase Decision constituted an agency action "without observance of procedure required by law," in violation of the APA, 5 U.S.C. § 706(2)(D).

**Claim Three: FSIS's Issuance of the 2018 Line Speed Increase Decision Violated the APA Because the Agency Engaged in Arbitrary and Capricious Decision-Making that Will Cause Increased Violations of the PPIA, PPIA Regulations, and FSIS Policy**

216.    The allegations set forth above are incorporated by reference.

217.    In issuing the 2018 Line Speed Increase Decision, FSIS failed to consider important aspects of the problem—the risks to slaughterhouse worker safety and animal welfare at facilities operating at higher line speeds.

218.    In issuing the 2018 Line Speed Increase Decision, FSIS did not assert that increasing line speeds would do anything to ameliorate the animal welfare problems associated with high line speeds at any facility operating with a line speed waiver.

219.    In issuing the 2018 Line Speed Increase Decision, FSIS changed its positions regarding: (a) how many NPIS chicken slaughterhouses the agency will permit to operate at speeds of up to 175 bpm; (b) whether rulemaking is necessary to change maximum line speeds in

slaughterhouses; (c) its earlier commitment to protecting the humane treatment of poultry and, by extension, food safety; (d) its authority to promulgate regulations related to slaughterhouse worker safety under the PPIA; (e) the relationship between line speed, slaughterhouse worker safety, and food safety; and (f) whether FSIS can consider the issue of slaughterhouse worker safety in setting maximum line speeds under the PPIA. FSIS failed to provide a reasoned analysis for its change in any of these positions.

220.    FSIS failed to meaningfully consider alternatives to the 2018 Line Speed Increase Decision that could reduce the adverse animal welfare and worker safety impacts of increasing line speeds, such as conditioning line speed increases on adoption of controlled atmospheric stunning or killing.

221.    Therefore, the agency engaged in arbitrary and capricious decision-making when it issued the 2018 Line Speed Increase Decision.

222.    Under the PPIA, "[c]arcasses of poultry showing evidence of having died from causes other than slaughter" must be condemned. 9 C.F.R. § 381.90. *See also* 21 U.S.C. §§ 453(g)(5); 455(c). Further, whole carcasses, or parts thereof, must be condemned if they are badly bruised. 9 C.F.R. § 381.89. Additionally, poultry must be "slaughtered in accordance with good commercial practices in a manner that will result in thorough bleeding of the carcasses and ensure that breathing has stopped prior to scalding." *Id.* § 381.65(b). Since at least 2005, FSIS has taken the position, that under the PPIA and FSIS's regulations, "live poultry must be handled in a manner that is consistent with good commercial practices, which means they should be treated humanely." Treatment of Live Poultry Before Slaughter, 70 Fed. Reg. at 56,624.

223.    The 2018 Line Speed Increase Decision will result in more chickens being treated inhumanely. Such inhumane treatment will cause more chickens to suffer bruising, die other than by slaughter, and be scalded alive. As a result, the 2018 Line Speed Increase Decision will

increase the risk that the resulting products will be adulterated and in violation of the PPIA, FSIS's regulations, and FSIS policy. *See* 21 U.S.C. §§ 453(g), 458(a)(1)-(3); 9 C.F.R. §§ 381.65(b), 381.89, 381.90; Treatment of Live Poultry Before Slaughter, 70 Fed. Reg. at 56,624-26.

224.   The PPIA requires FSIS inspectors to inspect "the carcass of each bird processed." 21 U.S.C. § 455(b).

225.   The 2018 Line Speed Increase Decision conflicts with the policy underlying the PPIA by increasing the risk that FSIS inspectors will not be able to inspect "the carcass of each bird processed." *See id.*

226.   FSIS regulations require all regulated poultry slaughter facilities to monitor their ability to maintain process control, 9 C.F.R. § 381.65(g), and slaughterhouses are "required to maintain process control." 2018 Federal Register Line Speed Notice, 83 Fed. Reg. at 49,058.

227.   Waivers issued pursuant to the 2018 Line Speed Increase Decision will cause an increased risk of loss of process control at those facilities that operate at higher speeds, in violation of FSIS requirements. *See* 9 C.F.R. § 381.65(g); 2018 Federal Register Line Speed Notice, 83 Fed. Reg. at 49,058.

228.   An FSIS regulation mandates that slaughterhouses operating under the line speeds authorized by the NPIS comply with all applicable requirements of law, including 29 U.S.C. § 654(a), which requires employers to provide work and workplaces "free from recognized hazards that are causing or are likely to cause death or serious physical harm to [their] employees." 9 C.F.R. § 381.69(d).

229.   The 2018 Line Speed Increase Decision will cause an increased risk of slaughterhouse worker injury in violation of 9 C.F.R. § 381.69(d).

230.    FSIS engaged in arbitrary and capricious decision-making when it issued the 2018 Line Speed Increase Decision. As a result, the Decision will increase the risk of violations of one or more provisions of the PPIA, the PPIA's implementing regulations, and FSIS policy.

231.    FSIS's regulation governing regulatory waivers does not allow FSIS to issue regulatory waivers that are "in conflict with the purposes or provisions of the [PPIA]." *Id.* § 381.3(b). The Decision, therefore, violates 9 C.F.R. § 381.3(b) because waivers issued under the Decision are "in conflict with the purposes or provisions of the [PPIA]."

232.    For these reasons, FSIS's issuance of the 2018 Line Speed Increase Decision constituted an agency action that was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" in violation of the APA, 5 U.S.C. § 706(2)(A).

**Claim Four: FSIS Violated the APA Because the Agency Did Not Comply with NEPA When It Issued the 2018 Line Speed Increase Decision**

233.    The allegations set forth above are incorporated by reference.

234.    Under NEPA, agencies must prepare an EIS for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.4(a)(1).

235.    Under CEQ's regulations requiring agencies to consider both context and intensity in determining the significance of environmental impacts, the 2018 Line Speed Increase Decision constitutes a major federal action significantly affecting the quality of the human environment. *See* 40 C.F.R. § 1508.27. Therefore, an EIS is required.

236.    FSIS improperly relied on the categorical exclusion created by 7 C.F.R. § 1b.4. Because the 2018 Line Speed Increase Decision will have a significant environmental effect, the program is ineligible for a categorical exclusion under 7 C.F.R. § 1b.4.

237.    In its invocation of the categorical exclusion, FSIS did not discuss whether CEQ's significance factors render the 2018 Line Speed Increase Decision ineligible for a categorical exclusion.

238.    FSIS did not adequately explain its conclusion that the categorical exclusion applies to the 2018 Line Speed Increase Decision because: (a) the agency failed to consider important aspects of the problem; (b) the agency relies on speculation, rather than concrete data, to support that conclusion; (c) the agency's conclusion conflicts with the information before the agency; and (d) the agency did not explain several non-obvious, essential assumptions regarding its conclusion that increasing line speeds at facilities would not result in an increase in the number of chickens slaughtered and that the program would not, therefore, have any significant environmental impact.

239.    In determining the 2018 Line Speed Increase Decision would not have any significant environmental effect, FSIS did not acknowledge or explain that it was treating materially similar factual situations—changes in the regulation of line speed in the pork and chicken industries—differently. In the former, the agency reasoned increased efficiencies could lead to an increase in the number of animals killed; in the latter, the agency concluded increased line speeds would have no impact on the number of animals killed.

240.    Under NEPA, an agency must "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E).

241.    FSIS failed to consider alternatives to the 2018 Line Speed Increase Decision that could reduce the environmental impacts of its action, such as conditioning line speed increases on adoption of controlled atmospheric stunning or killing.

242.   FSIS failed to comply with one or more requirements of NEPA and its implementing regulations when it issued the 2018 Line Speed Increase Decision.

243.   Accordingly, FSIS's issuance of the 2018 Line Speed Increase Decision is an action that violates NEPA, 42 U.S.C. § 4332(2)(C), and is therefore "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and is "without observance of procedure required by law," in violation of the APA, 5 U.S.C. § 706(2)(A), (D).

### PRAYER FOR RELIEF

For the foregoing reasons, Plaintiffs respectfully request that this Court enter an Order:

a.   Declaring that the 2018 Line Speed Increase Decision violates 9 C.F.R. § 381.3(b), and thus FSIS's issuance of the Decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," in violation of the APA, 5 U.S.C. § 706(2)(A);

b.   Declaring that FSIS's issuance of the 2018 Line Speed Increase Decision without engaging in notice-and-comment rulemaking or providing interested persons an opportunity for the oral presentation of views was an agency action "without observance of procedure required by law," in violation of the APA, 5 U.S.C. § 706(2)(D);

c.   Declaring that FSIS engaged in arbitrary and capricious decision-making when it issued the 2018 Line Speed Increase Decision, and thus issuance of the Decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," in violation of the APA, 5 U.S.C. § 706(2)(A);

d.   Declaring that FSIS issued the 2018 Line Speed Increase Decision without proper NEPA review, and thus issuance of the Decision was "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law" and "without observance of procedure required by law," in violation of the APA, 5 U.S.C. § 706(2)(A), (D);

e.  Vacating FSIS's 2018 Line Speed Increase Decision, including vacating the February 23, 2018 Constituent Update, September 28, 2018 Federal Register notice, and any waivers issued to slaughterhouses under the Decision;

f.  Remanding this matter to FSIS and enjoining FSIS from increasing chicken slaughter line speed limits unless the agency complies with the APA, the PPIA, and NEPA when authorizing such an increase;

g.  Awarding Plaintiffs attorney fees and all other reasonable expenses incurred in pursuit of this action; and

h.  Granting other such equitable and/or declaratory relief as the Court deems necessary, just, and proper.

Dated: February 25, 2020                            Respectfully submitted,

                                                    */s/ Bruce A. Wagman*
                                                    Bruce A. Wagman
                                                    Riley Safer Holmes & Cancila

                                                    *Attorneys for Plaintiffs The Humane Society*
                                                    *of the United States, Animal Outlook,*
                                                    *Mercy for Animals, Government*
                                                    *Accountability Project, and Marin Humane*

                                                    Margaret Robinson
                                                    Peter A. Brandt
                                                    Jonathan R. Lovvorn

                                                    *Attorneys for Plaintiff The Humane Society*
                                                    *of the United States*

4832-5911-4933, v. 1

Complaint for Declaratory and Injunctive Relief