JOSEPH H. HUNT
Assistant Attorney General
ERIC R. WOMACK
Assistant Branch Director
KEVIN P. HANCOCK
Trial Attorney
Civil Division, Federal Programs Branch
U.S. Department of Justice
1100 L Street NW
Washington, D.C. 20005
Telephone: (202) 514-3183
Fax: (202) 616-8470
E-mail: kevin.p.hancock@usdoj.gov

PRERAK SHAH
Deputy Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice
ERIKA NORMAN (CA Bar No. 268425)
4 Constitution Square
150 M Street, NE, Suite 2.900
Washington, D.C., 20002
Telephone: (202) 305-0475
Facsimile: (202) 305-0506
Email: Erika.norman@usdoj.gov

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| THE HUMANE SOCIETY OF THE UNITED STATES, ANIMAL OUTLOOK, MERCY FOR ANIMALS, GOVERNMENT ACCOUNTABILITY PROJECT, and MARIN HUMANE, <br><br> Plaintiffs, <br><br> v. <br><br> SONNY PERDUE, in his official capacity as the Secretary of Agriculture, PAUL KIECKER, in his official capacity as Administrator, Food Safety and Inspection Service, UNITED STATES DEPARTMENT OF AGRICULTURE, and FOOD SAFETY AND INSPECTION SERVICE, <br><br> Defendants. | No. 4:20-cv-1395-SBA <br><br><br> **MOTION TO DISMISS FOR LACK OF SUBJECT-MATTER JURISDICTION AND IMPROPER VENUE OR TO TRANSFER VENUE** <br><br> Judge: Hon. Saundra Brown Armstrong <br> Hearing: August 12, 2020 at 2:00 pm PT <br> Place: TBD |

## TABLE OF CONTENTS

NOTICE OF MOTION ................................................................................................................ 1

STATEMENT OF THE ISSUES .............................................................................................. 1

INTRODUCTION .................................................................................................................... 1

BACKGROUND ...................................................................................................................... 3

I.      FSIS'S IMPLEMENTATION OF THE NEW POULTRY INSPECTION SYSTEM ....... 3

II.     FSIS'S 2018 LINE-SPEED WAIVER CRITERIA AND ISSUANCE OF WAIVERS .... 6

III.    PROCEDURAL BACKGROUND ................................................................................ 8

ARGUMENT ........................................................................................................................... 8

I.      THE COURT SHOULD DISMISS FOR LACK OF SUBJECT-MATTER
        JURISDICTION BECAUSE PLAINTIFFS LACK STANDING ................................... 8

        A.      Plaintiffs' Alleged Injuries Are Not Fairly Traceable to the Line-Speed
                Waiver Criteria ............................................................................................... 9

        B.      Plaintiffs' Have Failed to Establish Organizational Standing ........................ 11

                1.      Plaintiffs Have Failed to Establish Standing on the Basis of Mission
                        Frustration and Diversion of Resources ............................................... 11

                        i.      Plaintiffs Have Not Alleged Any Actual or Imminent
                                Injuries to Their Activities Caused by the Criteria .................. 11

                        ii.     Plaintiffs Have Failed to Allege That Any Injuries to Their
                                Activities Run Counter to Their Organizational Purposes ......... 16

                2.      Plaintiffs Have Failed to Allege a Sufficient Procedural Injury
                        to Support their APA Notice-and-Comment Rulemaking Claim ............. 17

        C.      Plaintiffs' Have Failed to Establish Associational Standing .......................... 18

                1.      Plaintiffs Do Not Allege That They Are Voluntary Membership
                        Organizations and Do Not Identify Any Specific Members .................... 19

                2.      The Humane Society's Unidentified Members Have Not
                        Alleged Any Actual or Imminent Aesthetic, Health, Environmental,
                        or Emotional Injuries Caused by the Criteria ....................................... 20

        D.      Plaintiffs Have Failed to Plead a Sufficient Procedural or Informational
                Injury to Support Their NEPA Claim ............................................................ 22

II.     THE COURT SHOULD DISMISS FOR IMPROPER VENUE .................................. 23

III.    ALTERNATIVELY, THE COURT SHOULD TRANSFER THIS CASE TO
        THE DISTRICT OF COLUMBIA UNDER 28 U.S.C. § 1404(a) ................................ 24

        A.      Plaintiffs Could Have Brought This Case in the District of Columbia ............. 24

        B.      The Interests of Justice and Convenience of the Parties Favor Transfer ......... 24

CONCLUSION ....................................................................................................................... 25

### TABLE OF AUTHORITIES

**Cases**

*Am. Fed'n of Gov't Empls., AFL–CIO v. Glickman*,
 215 F.3d 7 (D.C. Cir. 2000) .................................................................. 25

*Am. Fed'n of Gov't Empls., AFL-CIO v. Veneman*,
 284 F.3d 125 (D.C. Cir. 2002) .......................................................... 4-5, 25

*Am. Legal Found. v. FCC*,
 808 F.2d 84 (D.C. Cir. 1987) ................................................................ 12

*Associated Gen. Contractors of Am., San Diego Chapter, Inc. v.
 Cal. Dep't of Transp.*,
 713 F.3d 1187 (9th Cir. 2013) ............................................................... 19

*Chamber of Commerce of U.S. v. E.P.A.*,
 642 F.3d 192 (D.C. Cir. 2011) .............................................................. 19

*Chief Prob. Officers of Cal. v. Shalala*,
 No. 95-cv-4644, 1996 WL 134890 (N.D. Cal. Mar. 14, 1996) ................ 17

*Clapper v. Amnesty Int'l, USA*,
 568 U.S. 398  (2013) ............................................................................ 20

*Ctr. for Food Safety v. Vilsack*,
 No. 15-cv-01590, 2016 WL 4698901 (N.D. Cal. Sept. 8, 2016) .............. 18

*Envtl. & Res. Conservation Org. v. U.S. Nuclear Regulatory Comm'n*,
 996 F.2d 1224 (9th Cir. 1993) .............................................................. 22

*Food & Water Watch, Inc. v. Vilsack*,
 79 F. Supp. 3d 174 (D.D.C. 2015) ......................................................... 17

*Food & Water Watch, Inc. v. Vilsack*,
 808 F.3d 905 (D.C. Cir. 2015) ....................................................... *passim*

*Found. on Econ. Trends v. Lyng*,
 943 F.2d 79 (D.C. Cir. 1991) ............................................................... 22

*Grand Council of Crees (of Quebec) v. FERC*,
 198 F.3d 950 (D.C. Cir. 2000) ............................................................. 22

*Grocery Mfrs. Ass'n v. EPA*,
 693 F.3d 169 (D.C. Cir. 2012) ............................................................... 9

*Hatch v. Reliance Ins. Co.*,
 758 F.2d 409 (9th Cir. 1985) ............................................................... 24

*Havens Realty Corporation v. Coleman*,
 455 U.S. 363 (1982) ...................................................................... 12, 16

*Hunt v. Wash. State Apple Advert. Comm'n*,
 432 U.S. 333 (1977) ......................................................................... 18-19

*Immigrant Assistance Project of L.A. Cty. Fed'n of Labor (AFL-CIO) v. I.N.S.*,
   306 F.3d 842 (9th Cir. 2002) ............................................................. 23

*Inherent.com v. Martindale-Hubbel*,
   420 F. Supp. 2d 1093 (N.D. Cal. 2006) .......................................... 24

*Int'l Longshore & Warehouse Union v. Nelson*,
   599 F. App'x 701 (9th Cir. 2015) ..................................................... 11

*Jones v. GNC Franchising, Inc.*,
   211 F.3d 495 (9th Cir. 2000) ............................................................ 24

*La Asociacion de Trabajadores de Lake Forest v. Lake Forest*,
   624 F.3d 1083 (9th Cir. 2010) .................................................... 12, 15

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ................................................................... 8-9, 20

*Miller v. Gammie*,
   335 F.3d 889 (9th Cir. 2003) ........................................................... 19

*Miranda v. Reno*,
   238 F.3d 1156 (9th Cir. 2001) ............................................................ 8

*Nat'l Council of La Raza v. Cegavske*,
   800 F.3d 1032 (9th Cir. 2015) ......................................................... 19

*Nev. Land Action Ass'n v. U.S. Forest Serv.*,
   8 F.3d 713 (9th Cir. 1993) ............................................................... 22

*Or. Prescription Drug Monitoring Program v. U.S. Drug Enf't Admin.*,
   860 F.3d 1228 (9th Cir. 2017) ......................................................... 20

*Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Dep't of Interior*,
   No. 12-2158 JSC, 2012 WL 3236163 (N.D. Cal. Aug. 6, 2012).......... 24-25

*Rodriguez v. City of San Jose*,
   930 F.3d 1123 (9th Cir. 2019) ......................................................... 16

*Safe Air for Everyone v. Meyer*,
   373 F.3d 1035 (9th Cir. 2004) ........................................................... 8

*Sierra Club v. Morton*,
   405 U.S. 727  (1972) ................................................................. 11-12, 22

*Simon v. E. Ky. Welfare Rights Org.*,
   426 U.S. 26 (1976) ............................................................................ 9

*Smith v. Pac. Props. & Dev. Corp.*,
   358 F.3d 1097 (9th Cir. 2004) ......................................................... 11

*Steel Co. v. Citizens for a Better Env't*,
   523 U.S. 83 (1998).............................................................................. 8

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009)................................................................ 17, 19-20

1
2
3
4
5
6
7

*Van Dusen v. Barrack*,
  376 U.S. 612 (1964) .................................................................................. 24

*Warth v. Seldin*,
  422 U.S. 490 (1975) ............................................................................ 18, 23

*W. Watersheds Project. v. Kraayenbrink*,
  632 F.3d 472 (9th Cir. 2011) ............................................................. 19-20

*Yesler Terrace Cmty. Council v. Cisneros*,
  37 F.3d 442 (9th Cir. 1994),
  *aff'd*, 118 F.3d 1327 (9th Cir. 1997) ........................................................ 17

8

## Statutes

9

21 U.S.C. § 451 ............................................................................................. 3

21 U.S.C. § 453(h) ......................................................................................... 4

21 U.S.C. §§ 456-57 ....................................................................................... 4

21 U.S.C. § 463(c) ........................................................................................ 18

28 U.S.C. § 1391 ................................................................................... 3, 23-24

28 U.S.C. § 1404(a) ................................................................................... 1, 24

28 U.S.C. § 1406(a) ..................................................................................... 23

42 U.S.C. §§ 4321-4370 ............................................................................... 22

10
11
12
13
14
15
16
17

## Regulations

7 C.F.R. § 2.53(a)(2)(i) ................................................................................. 3

9 C.F.R. § 381.3(b) ............................................................................... 5, 6, 7

9 C.F.R. § 381.69(a) ...................................................................................... 5

40 C.F.R. § 1501.3(a) ................................................................................... 22

40 C.F.R. § 1508.18 ..................................................................................... 22

Modernization of Poultry Slaughter Inspection,
  77 Fed. Reg. 4,408 (Jan. 27, 2012) ................................................. 4-5, 15

Modernization of Poultry Slaughter Inspection,
  79 Fed. Reg. 49,566 (Aug. 21, 2014) .................................................... 5

Petition to Permit Waivers of Maximum Line Speeds,
  83 Fed. Reg. 49,048 (Sept. 28, 2018) ............................................. 4-7, 10

18
19
20
21
22
23
24
25
26
27
28

**Other Authorities**

Letter from Michael J. Brown, President, National Chicken Council to Carmen Rottenberg, Acting Deputy Under Secretary for Food Safety, FSIS (Sept. 1, 2017), https://www.fsis.usda.gov/wps/wcm/connect/7734f5cf-05d9-4f89-a7eb-6d85037ad2a7/17-05-Petition-National-Chicken-Council-09012017.pdf?MOD=AJPERES ....................................... 6

FSIS, Constituent Update, FSIS' Criteria for Consideration of Waiver Requests from Young Chicken Slaughter Establishments to Operate at Line Speeds Up to 175 Birds Per Minute (Feb. 23, 2018), https://www.fsis.usda.gov/wps/wcm/connect/ee977696-7f87-4b87-8717-15a824ce0a81/ConstiUpdate022318.pdf?MOD=AJPERES&CONVERT_TO=url&CACHEID=ee977696-7f87-4b87-8717-15a824ce0a81 .................. 6

FSIS Constituent Update, FSIS No Longer Accepting Poultry Line Speed Waivers (Apr. 24, 2020), https://www.fsis.usda.gov/wps/portal/fsis/newsroom/meetings/newsletters/constituent-updates/archive/2020/ConstUpdate042420 ......................................... 8

FSIS Meat, Poultry and Egg Product Inspection Directory, https://www.fsis.usda.gov/wps/wcm/connect/bf8d9766-9767-4e0c-a9f1-efea0b2a42bc/MPI_Directory_Establishment_Name.pdf?MOD=AJPERES ................................... 8

*Salmonella* Initiative Program (SIP) Participants Table (May 4, 2020), https://www.fsis.usda.gov/wps/wcm/connect/188bf583-45c9-4837-9205-37e0eb1ba243/Waiver_Table.pdf?MOD=AJPERES ................................................. 7

**NOTICE OF MOTION**

Please take notice that on Wednesday, August 12, 2020 at 2:00 pm PT, before the Honorable Saundra Brown Armstrong, in a courtroom to be determined, Defendants will and hereby do move this Court for an order dismissing Plaintiffs' Complaint.  Defendants' motion seeks dismissal of all claims for lack of subject-matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1), and for improper venue pursuant to Rule 12(b)(3).  In the alternative, Defendants' motion requests that this case be transferred to the U.S. District Court for the District of Columbia pursuant to 28 U.S.C. § 1404(a).  Defendants' motion is based on this Notice, the accompanying Memorandum of Points and Authorities, the Court's files and records in this action, and any other matter that the Court may consider at oral argument or that may be judicially noticed.

**STATEMENT OF THE ISSUES**

Whether this case should be dismissed for lack of subject-matter jurisdiction or improper venue, or in the alternative, transferred to the U.S. District Court for the District of Columbia.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**INTRODUCTION**

Defendant Food Safety and Inspection Service ("FSIS") of the U.S. Department of Agriculture ("USDA") is charged with protecting consumer health and welfare by ensuring that poultry food products sold to consumers are safe and unadulterated.  To that end, FSIS inspectors monitor poultry slaughterhouse operations, including the use of automated evisceration systems that process poultry at particular line speeds.  In the mid-1990s, FSIS began an initiative to modernize its inspection systems by focusing agency resources on measures that prevent foodborne pathogens from reaching poultry processing lines, which in turn allowed slaughterhouses to produce unadulterated poultry at faster line speeds.  After the D.C. Circuit upheld this initiative, FSIS established the New Poultry Inspection System ("NPIS"), which is based on that initiative.  The NPIS is optional and sets the maximum processing line speed for participating poultry facilities at 140 birds per minute ("bpm").  In 2018, under its authority to grant waivers from its regulations, FSIS issued instructions to its regulated community

explaining the criteria and process under which it would consider applications from NPIS facilities for waivers from the 140 bpm limit (the "Line-Speed Waiver Criteria" or "Criteria"). Facilities receiving waivers would be permitted to operate up to 175 bpm so that FSIS could collect data to assess the ability of these facilities to produce safe poultry products at higher line speeds to inform a possible future rulemaking.  Starting in October 2018, FSIS issued 53 waivers before announcing that it had stopped accepting new waiver applications in March 2020.

Plaintiffs are five nonprofit organizations: the Humane Society of the United States ("Humane Society"), Animal Outlook, Mercy for Animals, Government Accountability Project ("GAP"), and Marin Humane.  Only Marin Humane resides in this District, while three Plaintiffs reside in the District of Columbia.  Plaintiffs assert four claims under the Administrative Procedure Act ("APA"), alleging that the Criteria do not comply with FSIS's waiver regulation, should have been issued using APA notice-and-comment rulemaking procedures, are arbitrary and capricious, and violate the National Environmental Policy Act ("NEPA").

Plaintiffs lack Article III standing to bring these claims.  First, none of the assorted injuries claimed by Plaintiffs are fairly traceable to the Line-Speed Waiver Criteria.  Plaintiffs' claimed injuries (including mission frustration and harm to animals and the environment) depend on the existence of slaughterhouses that applied for waivers, received them, and are processing increased amounts of poultry as a result.  But the Criteria do not require any of those steps, which depend instead upon the unfettered choices of poultry slaughterhouses and poultry consumers, who are third parties not before the Court.

Second, Plaintiffs have failed to allege an injury-in-fact that could support their organizational standing under a "mission frustration" theory, since they have not adequately alleged that the Criteria conflict with their missions and injure their ability to conduct their programmatic activities, as opposed to merely harming their abstract interests in animal welfare.

Third, because the Criteria have not caused a concrete injury to Plaintiffs' activities, the APA and NEPA procedural violations they allege, even if true, have caused them no separate, concrete harm, as required to provide standing.  The same flaw undermines Plaintiffs' claim to

have suffered an informational injury resulting from the lack of a NEPA environmental impact statement, since that alleged injury affects Plaintiffs no differently than any other person.

Fourth and finally, one Plaintiff, the Humane Society, claims that the Criteria have caused its "millions" of members aesthetic, health, environmental and emotional injuries, but it fails to specifically identify even one member who has suffered, or will imminently suffer, concrete and particularized harm, making it impossible to conclude that this allegation is anything other than a generalized grievance.  In any event, these alleged harms are all fatally speculative.  Even though FSIS issued 53 waivers in the 20 months preceding the filing of the operative complaint, the Humane Society can allege only that its members will likely suffer aesthetic, health, environmental, and emotional injuries at some unspecified point in the future.

The Court should also dismiss this case for improper venue, or in the alternative, transfer the case.  The one Plaintiff residing in this District, Marin Humane, clearly lacks standing for a combination of the reasons describe above.  Without that Plaintiff, venue is improper under 28 U.S.C. § 1391(e)(1)(A), and the case should be dismissed even if other Plaintiffs do have standing.  Alternatively, the Court should exercise its discretion to transfer this matter to the U.S. District Court for the District of Columbia, a venue where three Plaintiffs and all Defendants reside.  The interests of justice and convenience of the parties weigh in favor of transfer because the Complaint does not allege that any operative facts have occurred in this District (indeed, no facility that received a waiver is even located in California), while previous challenges to FSIS's regulation of poultry slaughterhouse processes have been heard in the District of Columbia.

## BACKGROUND

## I.     FSIS'S IMPLEMENTATION OF THE NEW POULTRY INSPECTION SYSTEM

FSIS is an agency of the USDA whose mission it is to protect the public's health by ensuring the safety of meat, poultry, and processed egg products.  FSIS administers the Poultry Products Inspection Act ("PPIA"), 7 C.F.R. § 2.53(a)(2)(i), which was enacted in 1957 to protect consumers "by assuring that poultry products distributed to them are wholesome, not adulterated, and properly marked, labeled, and packaged."  21 U.S.C. § 451.  To that end, the PPIA requires, among other things, that USDA inspectors conduct a "post mortem inspection of the carcass of

each bird processed" at slaughterhouses.  *Id.* § 455(b).  Establishments that slaughter or process poultry must be operated in accordance with the USDA's regulations setting forth sanitary practices and labeling requirements.  21 U.S.C. §§ 453(h), 456-57.

Most poultry slaughterhouses operate using an "automated evisceration system" that allows them to process poultry at a faster slaughter "line speed" than is possible when poultry is eviscerated by hand.  Modernization of Poultry Slaughter Inspection, 77 Fed. Reg. 4,408, 4,410 (Jan. 27, 2012).  FSIS had traditionally assigned its inspectors to slaughterhouse processing lines where they would physically inspect carcasses to detect signs of adulteration.  *Am. Fed'n of Gov't Empls., AFL-CIO v. Veneman*, 284 F.3d 125, 127 (D.C. Cir. 2002) ("*AFGE II*").  But this approach became outdated as visually detectable animal diseases became less common and thus less of a concern than foodborne human illness primarily caused by microbial contamination that cannot be detected visually.  77 Fed. Reg. at 4,411.  As a result, in the mid-1990s, FSIS started a comprehensive food safety initiative that shifted the agency's resources to focus on preventing invisible foodborne pathogens, such as *Salmonella*.  *AFGE II*, 284 F.3d at 127.  The initiative also sought to create incentives for processing plants to detect and eliminate adulterated carcasses before they reach an FSIS inspector.  *Id.*

As part of this initiative, FSIS started a pilot study called the "Hazard Analysis and Critical Control Point-Based Inspection Models Project" ("HIMP"), through which it designed and tested new inspection models using trials in volunteer poultry slaughter plants.  *AFGE II*, 284 F.3d at 127; *see also* Petition to Permit Waivers of Maximum Line Speeds, 83 Fed. Reg. 49,048, 49,408 (Sept. 28, 2018).  Under a revised version of HIMP, industry personnel were given primary responsibility for sorting normal from abnormal poultry carcasses on the processing line, while one FSIS inspector was stationed at the end of the line and another oversaw the plant's inspection efforts.  *AFGE II*, 284 F.3d at 127-28.  In addition, participating HIMP plants were permitted to operate at a line speed of up to 175 bpm.  77 Fed. Reg. at 4,411.  The 20 poultry plants that participated in HIMP demonstrated to FSIS that they could produce safe poultry while operating at that increased line speed.  *Id.*

In 2002, the U.S. Court of Appeals for the District of Columbia Circuit held that the HIMP did not violate the PPIA's requirement that FSIS inspect "the carcass of each bird process." *AFGE II*, 284 F.3d at 130.  Furthermore, the D.C. Circuit rejected the argument "that the line speeds used" by HIMP plants "are too fast," and instead found that they "are appropriate," given that "[f]ewer adulterated poultry carcasses . . . will be presented for federal inspection under the modified program . . . ." *Id.*

In 2014, based on data it collected from the 20 HIMP plants, FSIS established the New Poultry Inspection System, an optional inspection system for young chicken and turkey slaughter establishments, modeled on HIMP.  *See* Modernization of Poultry Slaughter Inspection, 79 Fed. Reg. 49,566 (Aug. 21, 2014).  Under the NPIS, establishment personnel are primarily responsible for the online identification of abnormal carcasses.  79 Fed. Reg. at 49,567.  This has allowed FSIS to "shift[] Agency resources to conduct more offline inspection activities that are more effective in ensuring food safety." *Id.*  While one FSIS inspector remains at the end of each poultry line to inspect carcasses, "additional offline verification inspectors . . . check to see [] that inspection protocols are being followed and conduct pathogen testing." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 916 (D.C. Cir. 2015) (citing 77 Fed. Reg. at 4,422).[1]

As for the maximum line speed for facilities using NPIS, FSIS had originally proposed 175 bpm, but ultimately decided to retain 140 bpm (except for the 20 former HIMP facilities, who were allowed to continue using 175 bpm) so that FSIS could assess facilities' ability to maintain process control as they transitioned to NPIS.  83 Fed. Reg. at 49,048; *see* 9 C.F.R. § 381.69(a).  In its notice of final rulemaking, FSIS explained that after the implementation of the NPIS on a wide scale for at least a year, the agency would reevaluate the appropriate maximum line speed at which NPIS facilities could produce safe poultry. 83 Fed. Reg. at 49,049.

---

[1]     In 2015, the D.C. Circuit affirmed the dismissal of a challenge to NPIS because the plaintiffs lacked Article III standing.  *Food & Water Watch, Inc.*, 808 F.3d at 909.

## II.      FSIS's 2018 LINE-SPEED WAIVER CRITERIA AND ISSUANCE OF WAIVERS

In 2017, FSIS received a petition from the National Chicken Council asking the agency to use its authority under 9 C.F.R. § 381.3(b) to implement a new waiver system that would allow poultry facilities to apply to waive the 140 bpm limit and operate without any maximum line speed ("Petition").  83 Fed. Reg. at 49,049.  Under section 381.3(b), FSIS's Administrator has the authority to "waive . . . any provisions of the [poultry inspection] regulations in order . . . to permit experimentation so that new procedures, equipment, and processing techniques may be tested to facilitate definite improvements," so long as such waivers "are not in conflict with the purposes or provisions of the [PPIA]."  FSIS posted the Petition on its website,[2] announced the availability of the Petition in an October 13, 2017 constituent update, solicited comments from the public, and accepted such comments until December 13, 2017.  83 Fed. Reg. at 49,049.

After considering all timely comments, FSIS issued its response to the Petition on January 29, 2018.  83 Fed. Reg. at 49,049.  In that response, FSIS denied the Petition's requests that the agency establish a new, separate waiver-request system to provide line-speed waivers and that the agency allow facilities to operate without a maximum line speed.  *Id.*  The response added, however, that "in the near future" FSIS would consider, under its already existing waiver procedures, requests for waivers to operate at line speeds of up to 175 bpm from facilities that could meet certain criteria.  *Id.* at 49,049-50.

A month later, on February 23, 2018, FSIS issued a "Constituent Update" announcing those criteria, including the requirement that a facility must have been operating under the NPIS for at least one year to receive a waiver.[3]  83 Fed. Reg. at 49,050.  FSIS also explained that because it would be "evaluat[ing] the establishment's ability to maintain process control" at speeds in excess of 140 bpm, facilities receiving waivers must consistently utilize the higher

---

[2]      *See* Letter from Michael J. Brown, President, National Chicken Council to Carmen Rottenberg, Acting Deputy Under Secretary for Food Safety, FSIS (Sept. 1, 2017), https://www.fsis.usda.gov/wps/wcm/connect/7734f5cf-05d9-4f89-a7eb-6d85037ad2a7/17-05-Petition-National-Chicken-Council-09012017.pdf?MOD=AJPERES.

[3]      FSIS, Constituent Update, FSIS' Criteria for Consideration of Waiver Requests from Young Chicken Slaughter Establishments to Operate at Line Speeds Up to 175 Birds Per Minute (Feb. 23, 2018), https://www.fsis.usda.gov/wps/wcm/connect/ee977696-7f87-4b87-8717-15a824ce0a81/ConstiUpdate022318.pdf?MOD=AJPERES&CONVERT_TO=url&CACHEID=e e977696-7f87-4b87-8717-15a824ce0a81.

speeds.  *Id.* at 49,051.  The 2018 Constituent Update concluded by stating that FSIS would

provide additional information in a future Federal Register notice, which FSIS issued on

September 28, 2018 ("2018 Notice").  *Id.* at 49,048.  Among other things, the 2018 Notice stated

that FSIS would use the data collected from establishments receiving waivers along with data

from the 20 HIMP facilities "to assess the ability of NPIS establishments to maintain process

control at higher line speeds and to inform future rulemaking, if supported."  *Id.* at 49,052.

The 2018 Notice also responded in detail to issues raised by the more than 100,000

comments FSIS received in response to the Petition.  83 Fed. Reg. at 49,052-60.  FSIS received

comments from an array of groups, including "animal welfare advocacy organizations,"

"environmental advocacy organizations," *id.* at 49,052, and three Plaintiffs in this case, *see* First

Am. Compl. for Declaratory and Injunctive Relief ("Compl.") ¶¶ 14, 38, 44, ECF No. 22.  The

arguments raised by the comments included: (1) that "the requested action does not meet any of

the criteria to qualify for a waiver under 9 C.F.R. § 381.3(b)," 83 Fed. Reg. at 49,053; (2) that

the petition "is an attempt to bypass the maximum line speed for the NPIS prescribed in the

regulations without going through the rule making process in violation of the" APA, *id.* at

49,054; (3) that "allowing NPIS establishments to operate at faster line speeds would have

adverse effects on the humane handling of poultry," *id.* at 49,057; and (4) that if line speeds were

increased, "the Agency must prepare an Environmental Impact Statement (EIS) as required

under" NEPA, *id.* at 49,058.

In October 2018, FSIS started issuing line-speed waivers.[4]  By the end of 2018, there

were 23 facilities that were allowed to operate up to 175 bpm, and by the end of April 2020,

FSIS had granted a total of 53 waivers.  *Id.*  On April 22, 2020, FSIS issued a Constituent Update

stating that the agency had stopped accepting new waiver requests on March 20, 2020, because,

"[b]ased on the waivers FSIS has approved, the agency will have enough data from

---

[4]      *See* Table 1, *Salmonella* Initiative Program (SIP) Participants Table (May 4, 2020),
https://www.fsis.usda.gov/wps/wcm/connect/188bf583-45c9-4837-9205-37e0eb1ba243/
Waiver_Table.pdf?MOD=AJPERES.

establishments to assess and determine whether to move forward with rulemaking."[5]  None of the 53 facilities that received waivers are located in California.[6]

## III.   PROCEDURAL BACKGROUND

On May 18, 2020, Plaintiffs filed their first amended complaint (the "Complaint") asserting four APA claims.  *See* ECF No. 22.  The Complaint states that the 2018 Constituent Update and the 2018 Notice (which Plaintiffs collectively call the "2018 Line Speed Increase Decision" but which Defendants call the "Line-Speed Wavier Criteria" or "Criteria") constitutes final agency action, Compl. ¶¶ 3 & n.3, 8, and violates the APA, the PPIA, and NEPA.  Claim One argues that the Criteria violate the APA because they do not comply with FSIS's regulation allowing regulatory waivers, 9 C.F.R. § 381.3(b).  Compl. ¶¶ 223-31.  Claim Two contends that the Criteria violate the APA because they were not issued using the APA's notice-and-comment rulemaking procedures.  *Id.* ¶¶ 232-39.  Claim Three asserts that the Criteria violate the APA because they are arbitrary and capricious.  *Id.* ¶¶ 240-56.  Claim Four argues that the Criteria violate NEPA because FSIS did not prepare an EIS or EA before releasing them.  *Id.* ¶¶ 257-67.  The Plaintiffs seek declaratory and injunctive relief.  *Id.* at 53-54.

## ARGUMENT

## I.   THE COURT SHOULD DISMISS FOR LACK OF SUBJECT-MATTER JURISDICTION BECAUSE PLAINTIFFS LACK STANDING

On a motion to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1), "the party invoking federal jurisdiction bears the burden of establishing its existence."  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 104 (1998).  Defendants bring a facial attack under Rule 12(b)(1), which "asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction."  *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th

---

[5]     *See* FSIS Constituent Update, FSIS No Longer Accepting Poultry Line Speed Waivers (Apr. 24, 2020), https://www.fsis.usda.gov/wps/portal/fsis/newsroom/meetings/newsletters /constituent-updates/archive/2020/ConstUpdate042420.

[6]     The location of each of the 53 facilities that have received line-speed waivers, *see supra* n. 4, is indicated on the FSIS Meat, Poultry and Egg Product Inspection Directory, which is located on FSIS's website at https://www.fsis.usda.gov/wps/wcm/connect/bf8d9766-9767-4e0c-a9f1-efea0b2a42bc/MPI_Directory_Establishment_Name.pdf?MOD=AJPERES (last visited on June 18, 2020).

Cir. 2004).  In evaluating a facial attack, the Court must accept the factual allegations in plaintiff's complaint as true.  *See Miranda v. Reno*, 238 F.3d 1156, 1157 n.1 (9th Cir. 2001).

Article III of the Constitution restricts the jurisdiction of the federal courts to "cases" or "controversies," and the "core component of standing is an essential and unchanging part" of that requirement.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  To establish Article III standing, Plaintiffs must satisfy three elements: (1) injury-in-fact; (2) causation; and (3) redressability.  *Lujan*, 504 U.S. at 560-61.

### A.     Plaintiffs' Alleged Injuries Are Not Fairly Traceable to the Line-Speed Waiver Criteria

In cases like this one, where "the plaintiff is not himself the object of the government action or inaction he challenges," standing "is ordinarily 'substantially more difficult' to establish."  *Lujan*, 504 U.S. at 562 (citation omitted).  This is because causation "'depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict.'"  *Id.* (citation omitted).  In such cases, the plaintiff must show that the regulated third party has or will make choices that result in causation.  *Id.*  Courts have long held that third-party actions are not fairly traceable to a regulation where that regulation *permits*, but does not require, the third party to take the action that directly results in a plaintiff's injury.  *See, e.g.*, *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 42-43 (1976) (holding that plaintiffs' injuries were not traceable to tax ruling that allegedly "encouraged" certain actions but did not require them); *Grocery Mfrs. Ass'n v. EPA*, 693 F.3d 169, 177 (D.C. Cir. 2012) (finding that plaintiff's alleged harms were not traceable to governmental actions where the approval of a new fuel "d[id] not force, require, or even encourage . . . introduc[tion] [of] the new fuel" but "simply permit[ted]" it).

Here, the various injuries-in-fact that Plaintiffs allege (including injuries to their animal welfare missions and their members' environmental interests) are not fairly traceable to the alleged final agency action that Plaintiffs challenge—the Line-Speed Waiver Criteria.  Plaintiffs' claimed injuries depend on the existence of slaughterhouses that chose to apply for waivers, received them, and are processing *increased amounts of poultry* as a result.  *See, e.g.*, Compl.

¶ 16 (asserting that "noxious stenches" and "pollution" will be "worsened" because the increased line speed "allows slaughterhouses to kill more birds than they otherwise would be able to"); ¶ 136 (contending that as a result of the Criteria, "more birds will be drowned alive in scalding hot water"); ¶ 162 ("By producing more birds, those growers would create more waste, use more water, and burn more fossil fuels while transporting animals[.]").

Yet the Criteria merely give poultry slaughterhouses *instructions on how to apply* for a waiver to operate at speeds up to 175 bpm. The Criteria do not require a slaughterhouse (a third party not before the Court) to take any of the subsequent steps necessary to produce more poultry. No facility is required to opt into NPIS, unless it seeks a line-speed waiver. *See* Compl. ¶ 54. The Criteria do not require any NPIS facility to apply for a line-speed waiver, and as Plaintiffs recognize, more than half of all NPIS facilities do not have waivers. *See id.* ¶ 108. The Criteria further do not require FSIS to grant any particular waiver. As Plaintiffs admit, the Criteria "set out requirements the agency would apply in granting *or denying* applications for waivers," Compl. ¶ 178 (emphasis added); indeed, FSIS has denied waiver applications, and as of March 2020, FSIS stopped accepting applications altogether, *see id.* ¶¶ 204-05; *supra* p. 7-8.

Finally, the Criteria do not require an establishment receiving a waiver to increase its poultry output as a result. While an increased line speed allows a facility to process chickens more *efficiently*, it does not require a facility to process a *greater number* of chickens or even guarantee that result. 83 Fed. Reg. at 49,058. FSIS has no authority to determine an establishment's output of poultry, which instead is controlled by fluctuating consumer demand. *Id.* Indeed, the Complaint recognizes that a facility receiving a waiver would only process more chickens than it had before if it also "continues to operate that line for [the same number of] hours a week," Compl. ¶ 161, which would not be necessary where a line speed of 175 bpm allows an establishment to meet consumer demand in less time.[7]

[7] For example, in August 2019, an industry website reported that, as "an immediate result of receiving a [line-speed] waiver," an Ohio poultry facility was able "to relax its production schedule from six to five days a week," resulting in "real weekends for family and social time," and "employees who are more engaged on the job, appreciating a true work/life balance." *See* Kimberlie Clyma, *Gerber Poultry Pride*, Meat+Poultry (Aug. 28, 2019), at https://www.meatpoultry.com/articles/21812-gerber-poultry-pride.

As a result, the alleged chain of causation between the Line-Speed Waiver Criteria and Plaintiffs' alleged injuries is broken by the uncertain choices of slaughterhouse facilities and poultry consumers—independent actors not before the court.  The Complaint does not, and could not, demonstrate that these third parties have or will make choices in a manner that results in causation.  For instance, the Complaint contains no allegations that any of the 53 facilities with waivers (18 of which are HIMP facilities that have been allowed to operate at 175 bpm since at least 2012, *see supra* n. 4) have increased their overall poultry output.  Nor does the Complaint allege any facts regarding the poultry market or how slaughterhouses respond to consumer demand.  To be sure, some slaughterhouses have opted into NPIS, have applied for waivers, and have received them, as the Complaint points out, *see, e.g.*, Compl. ¶ 5, but that would be true of any optional waiver program.  The Complaint makes no attempt to show that a sufficient number of slaughterhouses have obtained waivers and produced more poultry to cause or imminently threaten the assortment of injuries Plaintiffs claim to fear—an omission that is especially problematic given that the universe of facilities with waivers is now capped at 53.

Accordingly, the allegations of the Complaint, even accepted as true, fail to establish that Plaintiffs' claimed injuries are fairly traceable to the Line-Speed Waiver Criteria.  This fundamental flaw in Plaintiffs' alleged chain of causation undermines each of their claims of injury, which, in any event, suffer from their own additional defects as detailed below.

**B.     Plaintiffs Have Failed to Establish Organizational Standing**

To establish standing in their own right, "organizations, like individuals, must satisfy" all three standing requirements.  *See Int'l Longshore & Warehouse Union v. Nelson*, 599 F. App'x 701, 701 (9th Cir. 2015).  Plaintiffs have not established standing on the basis of mission frustration, procedural injury, or informational injury, as they claim.

**1.     Plaintiffs Have Failed to Establish Standing on the Basis of Mission Frustration and Diversion of Resources**

An organization can establish standing if it can demonstrate that a challenged statute or policy caused "(1) frustration of its organizational mission; and (2) diversion of its resources to

combat the [statute or policy] in question." *Smith v. Pac. Properties & Dev. Corp.*, 358 F.3d 1097, 1105 (9th Cir. 2004). Plaintiffs' allegations fall short for two reasons.

### i.    Plaintiffs Have Not Alleged Any Actual or Imminent Injuries to Their Activities Caused by the Criteria

To successfully demonstrate mission frustration, it is not enough for a plaintiff to show that it has a "mere 'interest in a problem,' no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem." *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972). Instead, the plaintiff must show, among other things, a "concrete and demonstrable injury to the organization's *activities*" that amounts to "far more than simply a setback to the organization's abstract social interests." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (emphasis added); *see also Am. Legal Found. v. FCC*, 808 F.2d 84, 92 (D.C. Cir. 1987) (explaining that "[t]he organization must allege that discrete programmatic concerns are being directly and adversely affected by the defendant's actions"). Here, each of the five Defendants' allegations are insufficient for multiple reasons.

*Humane Society.* The Humane Society alleges that its activities include educating the public, research, investigations, and litigation, Compl. ¶ 12, but does not allege that its ability to do any of those things has been harmed as a result of the Criteria, *see id.* ¶ 13. While the Humane Society claims that the Criteria "required" it to divert resources back to the issue of poultry line speeds, *id.*, that allegation fails to explain, as it must, how Plaintiff "would have suffered some other injury if it had not diverted resources to counteracting the problem." *La Asociacion de Trabajadores de Lake Forest v. Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010). In other words, an organization does not have "standing to sue based solely on its own decision regarding resources allocation" but rather must "be forced to divert resources in order to avoid an injury caused by defendant's conduct." *Id.* n.4. The Humane Society identifies no such injury.

*Animal Outlook.* For several reasons, Animal Outlook's claims of mission frustration also fall short. First, Animal Outlook's allegation that it has suffered injury because the Line-Speed Waiver Criteria will "increase the likelihood that animals are treated inhumanely," Compl.

¶ 24, may allege a setback to Animal Outlook's abstract social interests, but it does not constitute harm to Animal Outlook's programmatic activities.

Second, Animal Outlook alleges that it will have to conduct additional investigations of facilities that receive line-speed waivers, Compl. ¶ 32, and engage in efforts to "combat" and "educate the public about the Decision," *id.* ¶ 34, but it does not allege that the Criteria have impaired its ability to investigate, combat, or educate, as it must.

Third, Animal Outlook's predictions that it "will likely be forced" to conduct additional investigations in the future, Compl. ¶ 32, and that those investigations will cost more because the Criteria "will increase the likelihood that AO's investigators are injured while working on high-speed slaughter lines," *id.* ¶ 25, are too speculative. Animal Outlook does not allege that it was forced to conduct more investigations (or more expensive investigations) during the 20 months that preceded the filing of its Complaint, during which time FSIS issued 53 line-speed waivers. *See supra* p. 7. By the end of 2018 alone, there were already 23 facilities that were allowed to operate up to 175 bpm. *Id.* If the existence of these facilities did not force Animal Outlook to conduct more investigations or more expensive investigations by May 2020, it is not clear why that "will likely" occur in the future, as Plaintiff claims.

Fourth and finally, Animal Outlook alleges that it suffered "direct economic harm" when it had to pay its investigator more than it anticipated when the investigator was allegedly injured during its investigation of Amick Farms, a poultry plant in Maryland. Compl. ¶¶ 24, 27. But this alleged injury and any resulting economic harm could not have been caused by the Criteria or any later-issued waivers since Animal Outlook's investigation of Amick Farms took place from May to August 2018, *id.* ¶ 24, which was *before* FSIS finished issuing the Criteria in September 2018, *id.* ¶ 3, and started issuing line-speed waivers in October 2018, *id.* ¶¶ 5, 200.

***Mercy for Animals.*** Like Animal Outlook, Mercy for Animals alleges that the Line-Speed Waiver Criteria have forced it to divert resources to "focus investigative work" on facilities operating at 175 bpm, Compl. ¶¶ 45-46, but also like Animal Outlook, it does not claim that the Criteria have harmed its ability to do that work or any other activity.

*GAP.*  GAP's predictions that the Criteria will harm its ability to recruit and utilize "whistleblowers" who are inspectors at chicken processing facilities, Compl. ¶¶ 48-62, are also too speculative.  GAP does not allege that the Criteria have in fact harmed its whistleblower program since October 2018, when FSIS started to issue waivers.  *See id.*  Instead, GAP predicts that the Criteria "*would* greatly reduce" the value of its whistleblower outreach, *see id.* ¶ 53, and "*will* undermine" its whistleblower program, whose efforts "*will be* more difficult," meaning that GAP "*will have to* divert resources accordingly," *see id.* ¶ 54 (emphases added); *see also id.* ¶¶ 56-57, 61-62.  The Complaint offers no reason why the Court should merely assume that these harms are imminent, as they must be, given the lack of any actual harm over the previous year and a half and given that FSIS stopped accepting waiver applications in March 2020.

In any event, GAP's allegations of future harm to its efforts to recruit potential whistleblowers are also conjectural and hypothetical on their own terms.  They rest upon GAP's speculation that a long and unlikely chain of events will occur: (1) the Criteria must cause facilities to switch to NPIS, *see* Compl. ¶¶ 50, 54-55; (2) NPIS facilities with fewer federal inspectors on "the front lines" must produce fewer whistleblowers because federal inspectors enjoy special whistleblower protections that private inspectors do not, *see id.* ¶¶ 50, 52-53, 56-57; and (3) without these protections for federal whistleblowers, GAP's efforts to recruit whistleblowers must be rendered ineffective, *see id.* ¶¶ 50, 53-54, and more expensive, as GAP shifts to recruiting private whistleblowers, *see id.* ¶¶ 56, 57, 58, 59, 60, and loses "income" in the form of attorneys' fees from successful federal whistleblower claims, *see id.* ¶ 61.

There are several problems with GAP's reasoning that break the chain of causation and render its predictions of harm speculative.  First, the harms GAP claims to fear result (if at all) from a facility's *conversion to NPIS* (which shifts some FSIS inspectors from online to offline roles), not its operation at 175 bpm.  As Plaintiffs concede, NPIS facilities are not required to operate at 175 bpm, and more than half of all NPIS facilities operate at 140 bpm, not 175.  Compl. ¶¶ 4-5.  GAP does not claim that the predicted harm to its whistleblower program will be caused in particular by the subset of NPIS facilities with waivers, and thus, its asserted injuries are fairly traceable, if anywhere, to the NPIS (which it does not challenge), not the Criteria.

Second, GAP implies, but does not actually allege, that NPIS reduces the number of federal inspectors at slaughterhouses who could become whistleblowers (thus allegedly injuring its program). What GAP actually alleges is that the NPIS "removes federal inspectors *from the front lines*," *see* Compl. ¶ 56 (emphasis added), and results in a mere "shift in duties" for federal inspectors, *see id.* ¶ 53. To be sure, under NPIS, some federal inspectors are reallocated from online to offline inspection roles at facilities, which focus on preventing adulterated poultry from reaching the line in the first place by "check[ing] to see [] that inspection protocols are being followed and conduct pathogen testing." *Food & Water Watch, Inc.*, 808 F.3d at 916 (citing 77 Fed. Reg. at 4,422). But the Complaint makes no allegation regarding the impact of these "*increased* offline verification inspectors," *id.* (emphasis added), on GAP's assertion that NPIS will make it more difficult for GAP to recruit federal whistleblowers. The absence of any such allegation precludes an inference that NPIS as a whole decreases the number of inspectors at facilities who may become GAP whistleblowers. *Cf. id.* ("Plaintiffs' failure to account for the increase in offline inspections and their attendant impact on poultry production prevents us from inferring that the NPIS as a whole substantially increases the risk of foodborne illness.").

Third, even assuming *arguendo* that GAP's predicted harm could be fairly traceable to the Criteria (as opposed to NPIS), and that the Criteria would reduce the number of potential federal whistleblowers, GAP cannot claim economic injury on the basis of attorney's fees it speculates it would have been awarded in successful federal whistleblower lawsuits. *See* Compl. ¶ 61. While GAP characterizes these attorneys' fees as lost "income," *id.*, that is just another way of describing "litigation costs," which the Ninth Circuit has said are a self-inflicted injury that cannot support standing, *see Lake Forest*, 624 F.3d at 1088 (explaining that a plaintiff cannot "manufacture the injury by incurring litigation costs"). Moreover, GAP does not allege that the value of the lost fees would exceed the value of the time GAP would gain and the litigation costs it would avoid by not having to litigate the lost whistleblower suits in the first place.

Fourth and finally, there are two flaws with GAP's assertion that it is injured because inspectors working on lines moving at "nearly three birds per second" cannot "see the food being processed" and thus cannot act as effective whistleblowers. Compl. ¶ 62. First, this alleged

harm is not fairly traceable to the Criteria because GAP does not claim that it is possible for inspectors to see poultry being processed at 140 bpm, and in fact, GAP repeatedly suggests otherwise.  *See* Compl. ¶ 3 (calling 140 bpm "recklessly high"), ¶ 120 (questioning whether workers can adequately inspect birds on the line at 140 bpm), ¶ 143 (describing problems that "occurred in large numbers at the already too-high line speed maximum of 140 bpm").  Second, GAP again does not account for the role that offline verification inspectors (whose work is not affected by line speeds) play in the NPIS when it claims that higher line speeds will decrease "the quality of disclosures of food inspector whistleblowers[.]"  *Id.* ¶ 62.

*Marin Humane.*  Finally, Marin Humane also does not allege that the Criteria impair any of its activities, which include monitoring and investigating chicken shipments and local agriculture businesses, Compl. ¶¶ 66, 68, lobbying, *id.* ¶ 67, and education, *id.* ¶¶ 69-70.  Although Marin Humane claims that the Criteria will increase animal cruelty (and that it will have to divert resources as a result), an injury to its abstract interest in preventing harm to animals does not qualify as a "concrete and demonstrable injury to the organization's activities," *Havens*, 455 U.S. at 379.  In any event, Marin Humane's claims of future harm to its abstract interests are just as speculative as many of its co-plaintiffs' claims and fail to allege that any of these asserted harms have befallen it in the past 20 months that waivers have been in place.  *See id.* ¶ 71 (alleging that Marin Humane "will need to divert its resources"); *id.* ¶ 72 (claiming that it "will respond" to the line speed decision "by increasing its monitoring of trucks").

      **ii.**     **Plaintiffs Have Failed to Allege That Any Injuries to Their Activities Run Counter to Their Organizational Purposes**

In addition to pleading that the Criteria interfered with each organization's activities, Plaintiffs must allege that Defendants' actions "run counter to the organization's purpose." *Rodriguez v. City of San Jose*, 930 F.3d 1123, 1134 (9th Cir. 2019).  In other words, where an "organization alleges that a defendant's conduct has made the organization's *activities* more difficult, the presence of a direct conflict between the defendant's conduct and the organization's *mission* is necessary—though not alone sufficient—to establish standing." *Food & Water Watch, Inc.*, 808 F.3d at 921 n.9 (emphases in original; citation omitted).

Here, only three of the five Plaintiffs have even attempted to plead a conflict between the Criteria and their organization's mission, and those attempts fall short.  Animal Outlook, Mercy for Animals, and Marin Humane claim that as a result of the Criteria they will engage in *additional* investigations, education, outreach, and lobbying in the future.  *See* Compl. ¶¶ 25-33; 42-44, 71.  But all three Plaintiffs admit that they already conduct these activities to further their missions of preventing animal cruelty, *id.* ¶¶ 22, 42-44, 65-70, and so to the extent the Criteria allegedly will cause Plaintiffs to conduct *more* investigations, education, outreach, and lobbying, the Criteria cannot be in conflict with Plaintiffs' missions, *cf. Food & Water Watch, Inc. v. Vilsack*, 79 F. Supp. 3d 174, 202 (D.D.C.) (explaining that an animal-rights group's "purported need for increased expenditures for advocacy and outreach" to "fight" NPIS "has helped" the plaintiff because it "presumably fulfills its very purpose when it undertakes to marshal its resources to fight the good fight against agency action that it feels is improper and unwise"), *aff'd*, 808 F.3d 905 (D.C. Cir. 2015).

### 2. Plaintiffs Have Failed to Allege a Sufficient Procedural Injury to Support their APA Notice-and-Comment Rulemaking Claim

As the Supreme Court has explained, the mere "deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing."  *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009).  As a result, an alleged "failure to comply with the notice and comment provisions of the APA, is insufficient, standing alone, to constitute injury in fact," and instead, "[t]o have standing, a plaintiff must seek 'to enforce a procedural requirement the disregard of which *could impair a separate concrete interest*.'"  *Chief Prob. Officers of Cal. v. Shalala*, No. 95-cv-4644, 1996 WL 134890, at *3 (N.D. Cal. Mar. 14, 1996) (emphasis added) (quoting *Yesler Terrace Cmty. Council v. Cisneros*, 37 F.3d 442, 446 (9th Cir. 1994)), *aff'd*, 118 F.3d 1327 (9th Cir. 1997).

For two independent reasons, Plaintiffs' allegations of procedural injury fall short.  First, the Complaint does not establish that Plaintiffs have any separate concrete interests that were impaired.  As explained above, all Plaintiffs have failed to successfully allege any actual or

imminent injury to their programmatic activities or conflicts with their missions, and so even if a procedural violation did occur, it did Plaintiffs no harm.[8]

Second, and in any event, the Complaint makes clear that the absence of notice-and-comment rulemaking *could not have* impaired any separate concrete interests that the Humane Society, Animal Outlook, and Mercy for Animals may have had.  All three groups admit that they submitted comments in response to the Petition and that their comments were among the "prodigious number of comments opposing the agency's proposed speed increase."  *See* Compl. ¶¶ 4, 14, 38, 44.  Indeed, Plaintiffs' claims in this case are largely identical to the substance of comments submitted in response to the Petition and considered by FSIS before issuing the Criteria.  *See supra* p. 7.  While normally, the possibility that "the agency's decision *could be* influenced by the considerations raised through public comment" in an APA rulemaking is sufficient to establish a procedural injury, *Ctr. for Food Safety v. Visack*, NO. 15-cv-1590, 2016 WL 4698901, at *5 (N.D. Cal. Sept. 8, 2016) (emphasis added), here, there is no such possibility since FSIS issued its Line-Speed Waiver Criteria despite Plaintiffs' comments.[9]

### C. Plaintiffs' Have Failed to Establish Associational Standing

Not only do Plaintiffs lack standing in their own right, they also lack standing to sue on behalf of any members.  As a general rule, a party can assert only its own rights, not those of others.  *Warth*, 422 U.S. at, 499.  Although an exception to this bar on third-party standing allows an organization to have "standing solely as the representative of its members," *id.* at 511, that exception applies only if the organization can establish, among other things, that "its members would otherwise have standing to sue in their own right," *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

---

[8]      Furthermore, GAP alleges no procedural injury at all.  *See* Compl. ¶¶ 48-62.  Animal Outlook's and Mercy for Animals's allegations claiming procedural injury assert only a procedural right *in vacuo*: both groups claim that the lack of notice-and-comment rulemaking "deprived [them] of the opportunity to comment on the 2018 Line Speed Increase Decision," *id.* ¶¶ 39, 47, without attempting to connect that claimed procedural violation with any alleged injury to a separate concrete interest.

[9]      For the same reasons, Plaintiffs lack standing for any procedural violation that allegedly occurred under the PPIA, 21 U.S.C. § 463(c).  *See* Compl. ¶ 238.

### 1.   Plaintiffs Do Not Allege That They Are Voluntary Membership Organizations and Do Not Identify Any Specific Members

As an initial matter, no Plaintiff alleges that it is a voluntary membership organization or its functional equivalent, *see* Compl. ¶¶ 9-70, as required for associational standing, *Hunt*, 432 U.S. at 344.  Four of the five Plaintiffs do not allege that they have "members" at all.  *See id.* ¶¶ 20-70.  While Animal Outlook, Mercy for Animals, Marin Humane refer to their "supporters" and "employees," *id.* ¶¶ 34, 40, 46-47, 64, 75, no Plaintiff alleges that these non-members possess the indicia of membership described in *Hunt*.

Only the Humane Society alleges that it has "members," but, like the other Plaintiffs, the Humane Society fails to identify any specific member.  To establish associational standing, the Supreme Court and the Ninth Circuit require an organization to produce "'specific allegations establishing that at least one *identified member* had suffered harm or would suffer harm.'" *Associated Gen. Contractors of Am., San Diego Chapter, Inc. v. Cal. Dep't of Transp.*, 713 F.3d 1187, 1194 (9th Cir. 2013) ("*AGC*") (emphasis added) (quoting *Summers*, 555 U.S. at 498).[10] This "'requirement of naming the affected members'" cannot be satisfied by an organization's "general allegations in [the] complaint asserting that its members would suffer harm."  *AGC*, 713 F.3d at 1194-95 (quoting *Summers*, 555 U.S. at 498-99); *see also Chamber of Commerce of U.S. v. E.P.A.*, 642 F.3d 192, 199 (D.C. Cir. 2011) (explaining that "it is not enough to aver that unidentified members have been injured" for an organization to establish associational standing).

The Humane Society identifies none of its members despite alleging that it has "millions" of them.  *See* Compl. ¶ 11.  Instead, the Complaint generally avers that the Humane Society is suing "on behalf of its members," *id.* ¶ 15, that its "members spend time near slaughterhouses" or "live near factory farms," *id.* ¶ 16, and that "its members" have suffered alleged injuries, *id.* ¶¶ 17-19.  But without the identification of at least one specific member who has allegedly suffered a concrete and particularized injury-in-fact, it is not possible for the Humane Society to

---

[10]   Although a Ninth Circuit panel later questioned, in *dicta*, whether an organization is always required to identify injured individual members by name, that panel decided the case on other grounds and did not even cite, let alone question, the Ninth Circuit's previous ruling in *AGC*, *see Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1041 (9th Cir. 2015), whose holding it could not have disturbed in any event, *see Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (*en banc*) (holding that three-judge panels are bound by prior panel decisions, unless prior panel's reasoning or theory is clearly irreconcilable with intervening authority).

prove that these alleged injures to third parties are not mere generalized grievances asserted on behalf its "millions" of members.  *See W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 483 (9th Cir. 2011) (explaining that an organization must specifically identify at least one member because "'generalized harm . . . will not alone support standing'" (quoting *Summers*, 555 U.S. at 494)).  This omission is particularly glaring here, where it is entirely unknown whether any particular Humane Society member would suffer the alleged injuries due to FSIS granting a waiver to one of the many poultry establishments that exist throughout the country.

2.      **The Humane Society's Unidentified Members Have Not Alleged Any Actual or Imminent Aesthetic, Health, Environmental, or Emotional Injuries Caused by the Criteria**

Even if the Humane Society had identified any specific members, it would still lack associational standing because the Complaint fails to establish that any of its members would "have standing to sue in their own right." *Hunt*, 432 U.S. at 343.  A plaintiff's alleged injury-in-fact must be, among other things, "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (citation omitted).  The Humane Society does not claim that its members' alleged injuries are "actual," despite the 20 months that elapsed between FSIS starting to grant line-speed waivers and the Complaint.  Instead, the Humane Society rests its members' claim to standing upon a mere increased *risk* of suffering "aesthetic, health, environmental, emotional, and/or other injuries." *Id.* ¶¶ 16, 18, 21.

Given this absence of any actual harm, the Humane Society's allegations must satisfy the imminence requirement, which the Supreme Court has warned "cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending." *Clapper v. Amnesty Int'l, USA*, 568 U.S. 398, 409 (2013) (quoting *Lujan*, 504 U.S. at 565 n.2).  As a result, mere "'allegations of possible future injury' are not sufficient." *Or. Prescription Drug Monitoring Program v. U.S. Drug Enf't Admin.*, 860 F.3d 1228, 1235 (9th Cir. 2017) (quoting *Clapper*, 568 U.S. at 409).

Here, a long "speculative chain of possibilities," *Clapper*, 568 U.S. at 414, lies between the Line-Speed Waiver Criteria and the Humane Society's members' alleged injuries.  The Humane Society claims its members will (1) smell "the noxious stench emitted from" facilities

operating at 175 bpm; (2) be exposed to "pollution from trucks carrying chickens on their way to be killed at" facilities operating at 175 bpm; Compl. ¶ 16, and (3) "see[] chickens kept in cruel conditions on the trucks that transport them from" facilities operating at 175 bpm, *id.* ¶ 18.  But for several reasons, the Complaint's allegations do not establish that any of the Humane Society's members is at any risk of imminently experiencing these smells or sights.

As an initial matter, and as explained in detail above, *see supra* Part I.A, Plaintiffs can only speculate whether due to the Criteria a particular facility will (1) opt into NPIS; (2) apply for a line-speed waiver to operate at 175 bpm; (3) receive a waiver from FSIS; (4) actually process more chickens than it had before; and (5) generate the specific sights, smells, and pollution Plaintiffs claim will cause them harm.  But even if one could predict these steps with any degree of certainty, it is speculative whether any of the Humane Society's members will happen to live close enough to any such establishment to suffer the objectionable smells, exposures, and sights they claim will injure them.  The Humane Society inconsistently and vaguely claims that its members either "spend time near slaughterhouses" that received waivers, Compl. ¶ 16, "liv[e] in or near communities with" such slaughterhouses, *id.* ¶ 18, or "live near factory farms that supply such slaughterhouses," *id.* ¶ 16.  These allegations fail to provide any definition of "near" sufficient to establish that its unidentified members live close enough to actually smell "stench" from a facility, *id.*, or be exposed to "pollution from trucks" on their way to a facility, *id.*, or to actually "see[] chickens . . . on the trucks" leaving a facility, *id.* ¶ 18.  These allegations also notably fail to name any of the alleged members or the actual facilities they are "near," even though there are 53 facilities with waivers.  *Id.* ¶ 198; *see supra* n. 4.

Finally, even if the Humane Society had sufficiently pleaded that one of its identified members lives close enough to a poultry facility to be threatened with an imminent unpleasant environmental experience as a result of that plant receiving a line-speed waiver, the Humane Society has not alleged that this experience would be quantifiably different than what that member would normally experience living that close to a slaughterhouse.  Without such an allegation, the Criteria could not have caused the member any harm.

**D.      Plaintiffs Have Failed to Plead a Sufficient Procedural or Informational Injury to Support Their NEPA Claim**

Plaintiffs have also failed to plead a concrete injury-in-fact to support their claim under the National Environmental Policy Act, 42 U.S.C. §§ 4321-4370m-12.  *See* Compl. ¶¶ 257-67. In certain cases, NEPA requires federal agencies to prepare an Environmental Assessment ("EA") or an Environmental Impact Statement ("EIS") for new or revised agency rules significantly affecting the quality of the human environment.  40 C.F.R. §§ 1501.3(a), 1508.18(a), (b)(1).  Plaintiffs' NEPA claim is a purely procedural violation that is insufficient on its own to establish standing absent a showing of harm to Plaintiffs' concrete environmental or aesthetic interests, *Nev. Land Action Ass'n v. U.S. Forest Serv.*, 8 F.3d 713, 716 (9th Cir. 1993), which Plaintiffs have not established, *supra* Part I.C.2.

The Humane Society's and Marin Humane's claims of informational injury, Compl. ¶¶ 17, 20, 75, are also insufficient, standing alone, to establish standing for their NEPA claim. While NEPA serves an "informational role," *Grand Council of Crees (of Quebec) v. FERC*, 198 F.3d 950, 959 (D.C. Cir. 2000) (quotation marks and citation omitted), it does not establish an informational right, a violation of which gives rise to standing, *see Found. on Econ. Trends v. Lyng*, 943 F.2d 79, 84 (D.C. Cir. 1991) ("[W]e have never sustained an organization's standing in a NEPA case solely on the basis of 'informational injury,' that is, damage to the organization's interest in disseminating the environmental data an impact statement could be expected to contain.").  Allowing an informational injury alone to suffice for standing, the D.C. Circuit has observed, "would potentially eliminate any standing requirement in NEPA cases," because it represents no more than injury to an organization's "mere 'interest in a problem." *Id.* at 84-85 (quoting *Sierra Club*, 405 U.S. at 739).  The problem lies in that "one of NEPA's purposes is to provide information to the public," and so a denial of that information to any one plaintiff is an "injury" that is necessarily "undifferentiated and common to all members of the public." *Id.* at 85; *see also Envtl. & Res. Conservation Org. v. U.S. Nuclear Regulatory Comm'n*, 996 F.2d 1224 (9th Cir. 1993) (Rymer, J., concurring) (citing *Lyng* and stating that the plaintiff's "asserted informational injury is not associated with any redressable concrete injury").

Here, the Humane Society and Marin Humane claim nothing more than a pure informational injury, unassociated with any redressable, concrete injury. *See* Compl. ¶¶ 17, 20, 75. Both groups fail to explain how their lack of access to the information that would have been contained in an EIS or EA distinguishes them from any other person. *See id.* Indeed, the Humane Society alleges that the lack of an EIS or EA has deprived its members not only of information about how the Criteria would affect "their environment in their communities," but also the environment "nationally," *id.* ¶ 71, meaning that presumably every person in the United States has suffered the same generalized injury, *cf. Warth*, 422 U.S. at 499 (explaining that a case is not justiciable where the "asserted harm is a 'generalized grievance' shared in substantially equal measure by all or a large class of citizens").

## II.   THE COURT SHOULD DISMISS FOR IMPROPER VENUE

Rule 12(b)(3) authorizes a party to move to dismiss an action for improper venue. When venue is improper, the court "shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C. § 1406(a).

Under 28 U.S.C. § 1391(e)(1)(A), a civil action against an officer or employee of a United States agency may be brought in any judicial district in which "a defendant in the action resides." Here, Plaintiffs base venue in this District solely upon their allegation that "Plaintiff Marin Humane is located in and maintains its principal place of business in Novato, California." Compl. ¶ 9. Each of the other four Plaintiffs was either incorporated, or maintains its principal place of business, outside of this District, and three of those four Plaintiffs reside in the District of Columbia. *See* Compl. ¶¶ 11, 22, 40, 48.

In a case such as this one, where there are multiple plaintiffs, but only one plaintiff resides in the District where the suit was filed, "[t]he issue of [that plaintiff's] standing is particularly important because it is the only plaintiff . . . on whom, therefore, venue in the [district] could be based" under section 1391(e). *Immigrant Assistance Project of L.A. Cty. Fed'n of Labor (AFL-CIO) v. INS*, 306 F.3d 842, 867 n.20 (9th Cir. 2002). As detailed above, Marin Humane lacks standing. *See supra* Parts I.A-I.C. Accordingly, the Court should dismiss this case under Rule 12(b)(3) as to any other Plaintiffs the Court may conclude have standing.

1

### III.   ALTERNATIVELY, THE COURT SHOULD TRANSFER THIS CASE TO THE DISTRICT OF COLUMBIA UNDER 28 U.S.C. § 1404(a)

2

3        Even if venue exists under section 1391(e)(1)(A), the Court should nevertheless exercise

4   its discretion under 28 U.S.C. § 1404(a) to transfer this case to the U.S. District Court for the

5   District of Columbia.  Under section 1404(a), "[f]or the convenience of parties and witnesses, in

6   the interest of justice, a district court may transfer any civil action to any other district or division

7   where it might have been brought."  The purpose of Section 1404(a) is to "prevent the waste of

8   time, energy, and money and to protect litigants, witnesses and the public against unnecessary

9   inconvenience and expense."  *Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964) (internal citations

10   and quotation marks omitted).  The moving party bears the burden of showing that transfer is

11   appropriate.  *Inherent.com v. Martindale-Hubbel*, 420 F. Supp. 2d 1093, 1098 (N.D. Cal. 2006).

#### A.   Plaintiffs Could Have Brought This Case in the District of Columbia

12        To determine whether transfer is appropriate, the Court must first consider whether the

13   action could have originally been brought in those districts to which the transfer is sought.

14   *Hatch v. Reliance Ins. Co.*, 758 F.2d 409, 414 (9th Cir 1985); *Inherent.com*, 420 F. Supp. 2d at

15   1098.  Here, venue would exist in the U.S. District Court for the District of Columbia given that

16   three Plaintiffs—the Humane Society, Animal Outlook, and GAP—maintain their principal place

17   of business there.  Compl. ¶¶ 11, 22, 48; *see* 28 U.S.C. § 1391(c)(2) ("For all venue purposes . . .

18   an entity . . whether or not incorporated, shall be deemed to reside . . . if a plaintiff, only in the

19   judicial district in which it maintains its principal place of business").

#### B.   The Interests of Justice and Convenience of the Parties Favor Transfer

21        Second, courts considering a motion under section 1404(a) must conduct "an

22   individualized, case-by-case consideration of convenience and fairness," taking into account the

23   interests of justice and the convenience of the parties.  *Jones v. GNC Franchising, Inc.*, 211 F.3d

24   495, 498 (9th Cir. 2000) (citation omitted) (internal quotations omitted).  Here, three factors in

25   particular weigh in favor of transfer to the U.S. District Court for the District of Columbia.

26        First, the Plaintiffs' choice of forum "is entitled to only minimal consideration" in a case

27   like this one where "the operative facts have not occurred within the forum of original selection

28   and that forum has no particular interest in the parties or the subject matter."  *Pac. Coast Fed'n of*

*Fishermen's Ass'ns v. U.S. Dep't of Interior*, No. 12-cv-2158, 2012 WL 3236163, at *4 (N.D. Cal. Aug. 6, 2012) (citation omitted).  The Complaint does not identify any operative facts that have occurred within this District, and thus there is little if any local interest in this case.  None of the 53 plants that received waivers are even located in California, let alone this District.  *See* supra nn. 4, 6.[11]  The only Plaintiff who alleges that it has members does not claim that any of those members live in California.  Instead, the Humane Society claims it has members who live near facilities with waivers located in Arkansas and South Carolina.  *See* Compl. ¶ 16.

Second, there is an interest in having the case heard in the District of Columbia, which is most familiar with the pertinent case law given previous challenges to HIMP and the NPIS in that District's courts.  *See, e.g.*, *Am. Fed'n of Gov't Empls., AFL–CIO v. Glickman*, 215 F.3d 7, 9-10 (D.C. Cir. 2000) (finding that the first version of HIMP violated the PPIA); *AFGE II*, 284 F.3d at 130-31 (upholding a revised version of HIMP); *Food & Watch*, 808 F.3d at 909 (dismissing challenge to NPIS for lack of standing).

Third, and finally, although the "convenience" factors generally play a less significant role in an APA case, *Pac. Coast Fed'n of Fishermen's Assn's*, 2012 WL 3236163, at *5, here, they weigh strongly in favor of transfer to the District of Columbia given that all Defendants and three of the five Plaintiffs are located there.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully request that the Court dismiss this case for lack of subject-matter jurisdiction or improper venue, or in the alternative, transfer the case to the U.S. District Court for the District of Columbia.

---

[11]    Although Marin Humane alleges that it has previously investigated "broiler chickens, who fell off a truck in Marin" and as a result "increased its monitoring of trucks . . . that traveled through Marin County," Compl. ¶ 66, it does not allege that trucks carrying chickens processed by facilities receiving line-speed waivers have or in the future will pass through Marin County or anywhere else in the Northern District of California.

1    DATED: June 19, 2020                    Respectfully submitted,

2

3                                           JOSEPH H. HUNT
                                            Assistant Attorney General

4                                           ERIC R. WOMACK
                                            Assistant Branch Director
5
                                            */s/  Kevin P. Hancock*
6                                           KEVIN P. HANCOCK
                                            Trial Attorney
7                                           U.S. Department of Justice
                                            Civil Division, Federal Programs Branch
8                                           1100 L Street NW
                                            Washington, DC 20005
9                                           (202) 514-3183 (phone)
                                            (202) 616-8470 (fax)
10                                          kevin.p.hancock@usdoj.gov

11                                          PRERAK SHAH
                                            Deputy Assistant Attorney General
12
                                            ERIKA NORMAN (CA Bar No. 268425)
13                                          U.S. Department of Justice
                                            Environment and Natural Resources Division
14                                          4 Constitution Square
                                            150 M Street, NE, Suite 2.900
15                                          Washington, D.C., 20002
                                            Telephone: (202) 305-0475
16                                          Facsimile: (202) 305-0506
                                            Email: Erika.norman@usdoj.gov
17
                                            *Counsel for Defendants*
18

19

20

21

22

23

24

25

26

27

28