1

2

3

4

5

6

7

8        UNITED STATES DISTRICT COURT

9        NORTHERN DISTRICT OF CALIFORNIA

10       San Francisco Division

11   THE HUMANE SOCIETY OF THE            Case No. 20-cv-01395-LB
     UNITED STATES, et al.,
12
               Plaintiffs,
13                                        **ORDER GRANTING MOTION TO
          v.                              DISMISS**
14
                                          Re: ECF No. 25
     SONNY PERDUE, et al.,
15
               Defendants.
16

17                    **INTRODUCTION**

18       The plaintiffs are non-profit organizations challenging rules set by the U.S. Department of

19   Agriculture (USDA) on chicken-slaughter line speeds at certain chicken slaughterhouses. A 2014

20   regulation from the USDA's Food Safety and Inspection Service (FSIS) allows line speeds of 140

21   chickens per minute. In 2018, FSIS began allowing waivers for slaughterhouses that permit line

22   speeds of 175 chickens per minute. Then in 2022, after the change in leadership, the 2018 waivers

23   were terminated and modified waivers were allowed under new criteria (though the new criteria

24   incorporate the 2018 line-speed increase). The plaintiffs challenge the 2018 line-speed-increase

25   decision on the ground that it violates the Administrative Procedure Act (APA).

26       The defendants (USDA, FSIS, and agency officials) moved to dismiss the complaint on the

27   following grounds: (1) lack of standing; (2) the 2018 criteria are not final agency action; and (3)

28

United States District Court
Northern District of California

1    improper venue (assuming that Marin Humane lacks standing). Alternatively, the defendants ask

2    for transfer to the District of Columbia under 28 U.S.C. § 1404(a).

3        The plaintiffs lack standing: given the changed regulatory landscape, they have not met their

4    burden on traceability or redressability (but may be able to do so in an amended complaint). (The

5    plaintiffs do not have organizational standing, but The Humane Society has demonstrated

6    associational standing, at least absent the redressability issues.) The court reserves the other issues

7    for consideration after the filing of an amended complaint.

8

9                                            **STATEMENT**

10   **1.  The Challenged Waiver Decision**

11       From 2012 to 2014, FSIS engaged in rulemaking that resulted in the "New Poultry Inspection

12   System," an optional federal inspection system for chicken slaughterhouses. Under this system,

13   opt-in slaughterhouses could operate at line speeds up to 140 chickens per minute. During the

14   rulemaking, FSIS considered and rejected allowing all opt-in slaughterhouses to use line speeds of

15   up to 175 chickens per minute, but it did allow up to twenty slaughterhouses to do so.[1]

16       FSIS made its 2018 line-speed-increase decision through a February 2018 Constituent Update

17   and a September 2018 Federal Register notice (and not a rulemaking). The defendants allegedly

18   did not provide "any acceptable justification," failed to consider issues such as worker safety, and

19   failed to conduct a National Environmental Policy Act (NEPA) review. The 2018 decision, which

20   applies to slaughterhouses that use the New Poultry Inspection System, "clear[ed] the way for

21   dozens of slaughterhouses to kill chickens at an increased rate of 175 [chickens] per minute . . . if

22   [the slaughterhouses] meet certain minimal requirements." That is, the decision sets out criteria for

23   waivers from the 2014 line-speed regulation. (The plaintiffs thus allege that the 2018 decision

24   amended the 2014 rule.) "Nearly half" of chicken slaughterhouses using the New Poultry

25   Inspection System  are eligible for a waiver.[2]

26

27   [1] Am. Compl. – ECF No. 22 at 3 (¶ 4), 36–38 (¶¶ 165–74). Citations refer to material in the Electronic
     Case File (ECF); pinpoint citations are to the ECF-generated page numbers at the top of documents.

28   [2] *Id.* at 2–3 (¶¶ 3–4), 27–28 (¶ 108), 38–46 (¶¶ 175–222).

United States District Court
Northern District of California

1    The plaintiffs allege that the 2018 decision "will result in more inhumane treatment of

2    chickens, which FSIS has long recognized seriously threatens food safety," and "will also cause

3    harm to the environment and result in increased risk of injury for slaughterhouse employees."

4    These problems exist even at line speeds of 140 chickens per minute, but they will be exacerbated

5    at increased line speeds.[3]

6    The plaintiffs describe the chicken-slaughter process, from transportation from the factory

7    farm, to upside-down shackling on a conveyor line, to passage through electrified water to render

8    the chickens unconscious, to carotid-artery severing by a blade, to submersion of the deceased

9    chickens into a hot-water tank. The plaintiffs allege that each step entails a margin of error such

10   that the intended result at that step is not achieved for a certain number of chickens (but those

11   chickens still proceed to the next step).[4] The adverse effects from higher line speeds are essentially

12   that these error rates increase, resulting in problems such as bruising and broken bones (which

13   threaten food safety), inhumane treatment (for example, conscious chickens entering scalding

14   water at the final step), worker injuries (including exposure to chickens' waste), and

15   environmental harm (such as from increased water and fossil-fuel consumption).[5]

16

17   **2.  FSIS's 2022 Waiver Decision**

18   The parties do not dispute that in 2022, FSIS "terminated all line-speed waivers issued

19   pursuant to the 2018 Constituent Update and Federal Register notice and allowed establishments

20   that had received waivers under the 2018 criteria to apply for modified waivers subject to criteria

21   announced in a July 29, 2022 Constituent Update."[6]

22

23

24

25

26   [3] *Id.* at 3 (¶ 3), 27 (¶ 105), 28 (¶ 110).

[4] *Id.* at 28–30 (¶¶ 113–23).

27   [5] *Id.* at 30–36 (¶¶ 124–64).

28   [6] Joint Status Report – ECF No. 53 at 2.

ORDER – No. 20-cv-01395-LB                     3

### 3.  The Plaintiffs and Their Alleged Interests in the Challenged Waivers

The plaintiffs are five non-profit organizations: The Humane Society of the United States, Animal Outlook, Government Accountability Project, Mercy for Animals, and Marin Humane. Their missions relate to animal protection.[7] The plaintiffs, again, challenge only FSIS's 2018 waiver decision.[8]

The Humane Society is headquartered in the District of Columbia and has regional offices throughout the country. It "is the largest animal protection organization in the United States, representing millions of members and constituents nationwide." It "actively advocates for better laws and regulations to protect animals and the environment; conducts mission-specific campaigns to increase protections for domestic animals and wildlife; and advocates against practices that injure, harass, or otherwise harm animals." Through its farm-animal-welfare campaign, it "endeavors to raise awareness about farm animal confinement, raising, and slaughter practices," including their effect on pollution and public health, and "advocates to regulate such farm animal practices through efforts with administrative agencies, Congress, state legislatures, and the courts." FSIS's 2018 waiver criteria has required The Humane Society to "divert resources . . . to the issue."[9]

Some of The Humane Society's members "spend time near" slaughterhouses operating at higher line speeds and some "live near factory farms that supply such slaughterhouses, including members in Batesville, Arkansas; Imboden, Arkansas; and West Columbia, South Carolina." "These members are subject to aesthetic, health, environmental, and/or other harm resulting from these slaughterhouses' operations." In particular, the members are subject to "the noxious stench emitted from such slaughterhouses," "pollution from trucks carrying chickens on their way to be killed at such facilities," and the sight of chickens "kept in cruel conditions on the trucks." These harms "very likely have been and will continue to be worsened because of the increased speeds at which such slaughterhouses operate under the 2018" decision.[10]

---

[7] Am. Compl. – ECF No. 22 at 5–21 (¶¶ 11–75).

[8] *Id.* at 27 (¶ 106).

[9] *Id.* at 5–7 (¶¶ 11–14).

[10] *Id.* at 7–8 (¶ 16).

ORDER – No. 20-cv-01395-LB                    4

1    The Humane Society also alleges procedural and informational injuries on behalf of itself and

2  its members. They allegedly have a procedural interest in participating in FSIS's development of

3  regulations, including FSIS's considering information submitted by the public and its considering

4  the environmental impacts of its actions. "These interests were injured by FSIS's failure to engage

5  in the rulemaking process required by the APA and to conduct adequate environmental review as

6  required by NEPA before making the 2018" decision. Regarding the lack of a NEPA

7  environmental review, The Humane Society's members were allegedly deprived of relevant

8  information. And "[i]f FSIS had conducted notice-and-comment rulemaking . . . and conducted an

9  environmental review . . . , then [The Humane Society] and its members' procedural injuries

10  would be redressed" because they would have raised relevant objections.[11]

11    Animal Outlook has its principal place of business in the District of Columbia. It "works to

12  challenge the status quo of animal agribusiness," including by "conduct[ing] undercover

13  investigations of factory farms and industrialized slaughterhouses," advocating against

14  government policies, and coordinating public campaigns and public education. "A consistent core

15  component of its messaging has been education on the link between environmental degradation

16  and animal agriculture." For example, "[i]n November 2018, [Animal Outlook] released an

17  investigation of Amick Farms, a chicken slaughterhouse on Maryland's Eastern Shore that FSIS

18  allows to operate at line speeds of up to 175 [chickens per minute]." Animal Outlook also alleges

19  that it "suffered direct economic harm because of the increased line speeds at Amick Farms

20  because the organization was required to compensate its investigator more than anticipated,

21  specifically because of the investigator's injuries caused by the increased line speeds." And

22  Animal Outlook alleges that it will be forced to reallocate resources as a result of FSIS's 2018

23  decision, because it will have to do more investigations of chicken slaughterhouses to document

24  the alleged cruelty resulting from increased line speeds.[12]

25

26

---

27  [11] *Id.* at 7–9 (¶¶ 15, 17–21).

28  [12] *Id.* at 9–13 (¶¶ 22–39).

United States District Court
Northern District of California

United States District Court
Northern District of California

1      Mercy for Animals' principal place of business is in Los Angeles. Its mission "is to construct a

2   compassionate food system by reducing suffering and ending the exploitation of animals for

3   food." The organization "works with companies to adopt animal welfare policies and plant-based

4   alternatives to animal products, advocates for government policies that reduce the suffering of

5   animals used for food, and educates the public regarding farm animal welfare and the dire

6   environmental consequences of animal agriculture." "In particular, [Mercy for Animals] works

7   with companies to transition away from the hanging and shackling of live birds during the

8   slaughter process." The organization alleges that "[b]y enabling facilities to operate at higher line

9   speeds, FSIS allows companies to continue the inhumane practices of hanging and shackling more

10   live birds — frustrating [Mercy for Animals'] corporate outreach work that is specifically aimed at

11   eliminating live hanging and shackling." Because of FSIS's 2018 decision, Mercy for Animals has

12   allegedly had to divert resources from other activities (such as investigations related to other

13   animals "or other aspects of farmed animal welfare").[13]

14      The Government Accountability Project is based in the District of Columbia. Its mission "is to

15   promote corporate and government accountability by protecting whistleblowers and promoting

16   social and political awareness of the accountability whistleblowers provide to our democratic

17   society." "Food safety has been an area of interest . . . since the organization's founding." The

18   organization "provides educational outreach to food industry employees, promotes legislative

19   initiatives, initiates litigation, and provides multimedia resources to promote transparency."[14]

20      The Government Accountability Project alleges two injuries from FSIS's 2018 decision. The

21   first is in the form of the decision's reduced reliance on federal poultry inspectors. The

22   organization has "invested significant expense and personnel time in outreach to public sector

23   employees" because of their statutory whistleblower protections. It relies on food-industry

24   whistleblowers, "including federal inspectors in chicken slaughterhouses." It thus alleges that a

25   shift from public-sector to private-sector inspectors "would greatly reduce the value of [its]

26

27   [13] *Id.* at 13–15 (¶¶ 40–47).

28   [14] *Id.* at 15–16 (¶¶ 48–49).

ORDER – No. 20-cv-01395-LB                                6

1    outreach to public sector employees." The 2018 decision's changes will force the organization to

2    "develop outreach for private . . . whistleblowers, which will put a drain on other areas of

3    expenditure." It will also lose access to the attorney's fees awards available under the

4    Whistleblower Protection Enhancement Act of 2012 for successful public-sector whistleblower

5    claims.[15]

6        The second injury alleged by the Government Accountability Project is that "increased

7    slaughter line speeds reduce the ability of the inspectors working in facilities operating at such

8    speeds to see food industry practices that compromise food safety (and therefore such inspectors'

9    ability to blow the whistle on food safety issues)." The Government Accountability Project "has

10   seven affidavits from current USDA/FSIS employees describing the impossible task of inspecting

11   nearly three birds per second." Thus, "the quality of disclosures of food inspector whistleblowers

12   will decrease, frustrating [the Government Accountability Project's] mission further and forcing

13   [it] to shift resources to deal with this issue."[16]

14       The last plaintiff, Marin Humane, is based in Novato, California. As the animal-services

15   agency for Marin County, it "offers refuge, rehabilitation, and support services to more than

16   10,000 animals each year." It also "has an active anticruelty and advocacy program and routinely

17   supports legislation directed at reducing cruelty to all animals." It investigates farm-animal

18   cruelty, "rescues chickens from abusive situations, and monitors chickens moving through Marin

19   on their way to slaughter." For example, it "was involved in an extensive investigation of cruelty

20   to broiler chickens, who fell off a truck in Marin, on the way to slaughter." It has also "been

21   actively involved in monitoring and investigations of local agricultural businesses, including local

22   custom slaughter facilities." It runs an annual Animal Law Enforcement Academy that includes

23   "issues surrounding slaughter" and is attended by people involved "in the application of state

24   statutes addressing animal cruelty issues." Because of FSIS's 2018 decision, Marine Humane will

25   allegedly "need to divert its resources dedicated to its core programs in order to evaluate and

26

27   [15] *Id.* at 16–18 (¶¶ 50–61).

28   [16] *Id.* at 18–19 (¶ 62).

1   investigate the possibility that chickens who will be subject to increased line speeds will be

2   transported through Marin County." The increased line speeds will allegedly "increase the number

3   of incidents of animal cruelty throughout [California]," causing Marin Humane to "respond by

4   increasing its monitoring of trucks loaded with chickens that travel through the County."[17]

5

6   **4.  Procedural History**

7        The plaintiffs assert four claims that FSIS's 2018 decision violated the APA: (1) the decision

8   was "not in accordance with law," 5 U.S.C. § 706(2)(A), because it did not comply with FSIS's

9   regulation setting requirements for regulatory waivers, 9 C.F.R. § 381.3(b); (2) the decision

10  amended existing regulations (the 2014 line-speed limit of 140 chickens per minute, 9 C.F.R.

11  § 381.69(a), and the regulation setting requirements for regulatory waivers, 9 C.F.R. § 381.3(b))

12  without complying with the APA's rulemaking requirement, 5 U.S.C. § 553; (3) the decision was

13  arbitrary and capricious, 5 U.S.C. § 706(2)(A), because it will cause increased violation of the

14  Poultry Products Inspection Act, 21 U.S.C. §§ 453, 455 & 458, and that Act's regulations,

15  9 C.F.R. §§ 381.89–.90, which also means the decision violates FSIS's regulation setting

16  requirements for regulatory waivers, 9 C.F.R. § 381.3(b); and (4) the decision violated the APA, 5

17  U.S.C. § 706(2)(A) & (D), because FSIS did not prepare an environmental-impact statement as

18  required by NEPA, 42 U.S.C. § 4332(2)(C).[18] The plaintiffs ask for declaratory and injunctive

19  relief, including an order vacating FSIS's 2018 decision and all waivers issued under that decision.

20  The plaintiffs also ask for remand to the agency to enjoin "any future chicken slaughterhouse line

21  speed increases unless the agency complies with the APA, the [Poultry Products Inspection Act],

22  and NEPA."[19]

23

24

25

26

27  [17] *Id.* at 19–21 (¶¶ 63–75).

    [18] *Id.* at 46–52 (¶¶ 223–67).

28  [19] *Id.* at 5 (¶ 7), 53–54 (Prayer for Relief).

1    The court has subject-matter jurisdiction (assuming the plaintiffs have standing). 28 U.S.C.

2    § 1331. All parties consented to magistrate-judge jurisdiction.[20] *Id.* § 636(c). The court held a hearing

3    on February 15, 2024.

**STANDARD OF REVIEW**

5    A complaint must contain a short and plain statement of the grounds for the court's

6    jurisdiction. Fed. R. Civ. P. 8(a)(1). The party asserting jurisdiction has the burden of establishing

7    jurisdiction. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *Ass'n of Am.*

8    *Med. Colls. v. United States*, 217 F.3d 770, 778–79 (9th Cir. 2000).

9    A defendant's Rule 12(b)(1) jurisdictional attack can be facial or factual. *White v. Lee*, 227

10   F.3d 1214, 1242 (9th Cir. 2000). "A 'facial' attack asserts that a complaint's allegations are

11   themselves insufficient to invoke jurisdiction, while a 'factual' attack asserts that the complaint's

12   allegations, though adequate on their face to invoke jurisdiction, are untrue." *Courthouse News*

13   *Serv. v. Planet*, 750 F.3d 776, 780 n.3 (9th Cir. 2014). If the defendant mounts a factual attack, he

14   may rely on "affidavits or any other evidence properly before the court," in which case it

15   "becomes necessary for the party opposing the motion to present affidavits or any other evidence

16   necessary to satisfy its burden of establishing that the court, in fact, possesses subject matter

17   jurisdiction." *St. Clair v. City of Chico*, 880 F.2d 199, 201 (9th Cir. 1989). In such cases, "[t]he

18   district court obviously does not abuse its discretion by looking to this extra-pleading material in

19   deciding the issue, even if it becomes necessary to resolve factual disputes." *Id.*

20   Dismissal of a complaint without leave to amend should be granted only when the jurisdictional

21   defect cannot be cured by amendment. *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052

22   (9th Cir. 2003).

**ANALYSIS**

24   **1. Article III Standing**

25    "The 'irreducible constitutional minimum' of standing consists of three elements." *Spokeo,*

26   *Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560

27

---

28   [20] Consents – ECF Nos. 47–48.

United States District Court
Northern District of California

1   (1992)). "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the

2   challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial

3   decision." *Id.* (citing *Lujan*, 504 U.S. at 560). "The plaintiff, as the party invoking federal

4   jurisdiction, bears the burden of establishing these elements." *Spokeo*, 1578 U.S. at 1547.

5   **1.1 Whether the Plaintiffs' Injuries are Fairly Traceable to the 2018 Waiver Criteria**

6   The defendants contend that the plaintiffs' injuries stem from waivers issued pursuant to the

7   2018 waiver criteria, not the criteria themselves. Put another way, if no waivers had issued, then the

8   harms alleged — harms to the animal-welfare mission and the members' environmental interests —

9   would not have occurred. Instead, the plaintiffs challenge only FSIS's 2018 decision (that is, the

10  waiver criteria for slaughterhouses to use maximum line speeds of 175 rather than 140 chickens per

11  minute).[21] Another issue is that on March 20, 2020, FSIS stopped accepting waiver applications

12  under the 2018 waiver criteria.[22] Then, in July 2022, FSIS terminated all waivers under the 2018

13  criteria and allowed establishments with existing waivers to apply for modified line-speed waivers

14  by September 1, 2022.[23] FSIS is not accepting line-speed waivers on any basis.[24]

15  The plaintiffs respond that "the higher line speeds authorized by the 2018 [d]ecision" are fairly

16  traceable to their injuries because the increased line speeds caused the plaintiffs to suffer resource

17  diversion and mission frustration. The plaintiffs also point out that the 2022 waiver criteria and

18  subsequent waivers build on the 2018 decision.[25]

19  At least on the injury prong, the fact that the plaintiffs challenge only the 2018 waiver criteria,

20  and not the 2022 criteria or any actual waivers, does not necessarily mean the plaintiffs lack

21  standing. The 2018 criteria increased FSIS's line-speed maximum to 175 chickens per minute, and

22  the parties do not dispute that the 2022 criteria incorporate that line-speed increase, which is what

23

24  _____

25  [21] Defs.' Second Suppl. Br. – ECF No. 58 at 7.

    [22] *Id.* at 10 (citing Constituent Update, available at https://www.fsis.usda.gov/news-events/news-press-
26  releases/constituent-update-april-24-2020).

    [23] *Id.* (citing Constituent Update, July 29, 2022).
27  [24] *Id.*

28  [25] Pls.' Opp'n to Defs.' Second Suppl. Br. – ECF No. 60.

1   the plaintiffs challenge in this case. They allege diversion of resources as a result. And where third

2   parties engage in "injurious [conduct] that would have been illegal without [the challenged

3   government] action," the plaintiff's injury is fairly traceable to that government action. *Simon v. E.*

4   *Kentucky Welfare Rts. Org.*, 426 U.S. 26, 45 n.25 (1976). That is, but for the 2018 criteria, no

5   slaughterhouses would be operating at 175 chickens per minute.

6       That said, an issue is redressability, which bleeds into the traceability prong. The plaintiffs ask

7   for declaratory and injunctive relief addressing the line-speed increase, and they assert that a

8   favorable decision would redress their alleged injuries. The defendants counter that while

9   invalidating the 2018 criteria might imply that current waivers are invalid, it would not invalidate

10   the waivers. Thus, absent invalidating the waivers, the court cannot redress the plaintiffs' injuries.[26]

11       Even if the court construed the request for equitable relief as a request to invalidate the

12   waivers, the problem is that the 2022 criteria added criteria to those contained in the 2018 criteria.

13   Also, the plants can operate above the 140-chicken limit only if they receive a waiver from the

14   agency. FSIS can issue waivers under the regulations. 9 U.S.C. § 381.3(b). The validity of a

15   waiver seemingly turns on whether it complies with the waiver regulation and the Poultry

16   Products Inspection Act, not merely on the 2018 criteria (or the 2022 criteria predicated on the

17   2018 criteria).[27] The plaintiffs challenge 2018 agency guidance that is part of the authorization for,

18   but not the ultimate action that authorized, third-party injurious conduct. And there was no

19   entitlement to the waivers, which in any event were suspended. The operative complaint predates

20   the changed regulatory landscape. The court thus cannot easily evaluate standing or justiciability.

21       Another issue is that not only has FSIS terminated all waivers under 2018, but also, its attempt

22   to return to the 2018 criteria is possible but discretionary.

23       In sum, the regulatory landscape has changed since the initial complaint and the initial motion to

24   dismiss. There are now eight briefs that update arguments based on the new landscape, but the

25   complaint does not have any of that information. The defendants raise substantial arguments about

26

27   [26] Defs. Suppl. Reply Br. – ECF No. 61 at 6.

28   [27] *Id.* at 9 (making this point).

United States District Court
Northern District of California

1   the effect of the termination of the waivers and the effect on standing and the justiciability of the

2   dispute.[28] The plaintiffs have the burden of establishing standing. They have not established that

3   injuries from the poultry establishments were traceable to the 2018 waiver criteria or are redressable.

4   They can try to do so in an amended complaint that addresses the changed regulatory landscape,

5   including the termination of the waivers and the issuance of modified waivers under the 2022 criteria.

6   **1.2 Organizational and Associational Standing**

7       The next issue is whether the plaintiffs have established organizational or associational

8   standing (leaving aside the issues around redressability).

9       **1.2.1 Direct Standing**

10      An organization has "direct standing to sue" when it shows "a drain on its resources from both

11  a diversion of its resources and frustration of its mission." *Fair Hous. of San Fernando Valley v.*

12  *Roommate.com, LLC*, 666 F.3d 1216, 1219 (9th Cir. 2012). The organization's standing "must be

13  established independent of the lawsuit filed by the plaintiff." *Id.* That is, "[a]n organization cannot

14  manufacture the injury by incurring litigation costs or simply choosing to spend money fixing a

15  problem that otherwise would not affect the organization at all." *Valle del Sol Inc. v. Whiting*, 732

16  F.3d 1006, 1018 (9th Cir. 2013) (cleaned up). A mere "setback to the organization's abstract social

17  interests" is also not enough. *Ctr. for Food Safety v. Perdue*, 517 F. Supp. 3d 1034, 1041 (N.D.

18  Cal. 2021). But "a diversion-of-resources injury is sufficient to establish organizational standing at

19  the pleading stage, even when it is broadly alleged." *Id.* (quoting *Nat'l Council of La Raza v.*

20  *Cegavske*, 800 F.3d 1032, 1040 (9th Cir. 2015)).

21      Even though a diversion-of-resources injury can be broadly alleged, "[a]n organization may sue

22  only if it was forced to choose between suffering an injury and diverting resources to counteract the

23  injury." *La Asociacion de Trabajadores de Lake Forest v. Lake Forest*, 624 F.3d 1083, 1088 n.4

24  (9th Cir. 2010). The organization must "show that it would have suffered some other injury if it had

25  not diverted resources to counteracting the problem." *Id.* at 1088. Alleging a diversion of resources,

26  without more, is not enough. *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1040 (9th Cir.

27

28  _____
    [28] Joint Status Report – ECF No. 53 at 4.

2015) ("The complaint specifically alleges that Plaintiffs expended additional resources that they would not otherwise have expended, and in ways that they would not have expended them."); *In Def. of Animals v. Sanderson Farms, Inc.*, No. 20-cv-05293-RS, 2021 WL 4243391, at *4 (N.D. Cal. Sept. 17, 2021) (it is not enough that an organization "investigat[ed] conduct or start[ed] a new campaign against someone who frustrates its general mission"). But it is enough to allege that the organization diverted resources rather than spending time, staff, and money on other activities related to their organizational mission. *League of Women Voters of Cal. v. Kelly*, No. 17-cv-02665-LB, 2017 WL 3670786, at *6–7 (N.D. Cal. Aug. 25, 2017) (collecting and analyzing cases holding that it is sufficient at the pleadings stage to show a drain on resources both from a diversion of resources and a frustration of the organization's mission).

First, as to The Humane Society, the plaintiffs contend only that it has associational standing (discussed below). In any event, the allegation — that it has had to "divert resources . . . to the issue" of increased line speeds[29] — is not enough for organizational standing.

Second, Animal Outlook did not allege that it diverted resources and alleges only that it will have to do more investigations of chicken slaughterhouses in response to the 2018 decision. Its investigator suffered an injury in 2018 but that is not fairly traceable to the 2018 decision (at minimum) because it preceded any waivers issued pursuant to the decision.[30]

Third, Mercy for Animals alleges that its corporate outreach work related to live hanging and shackling of chickens has been frustrated and that it has had to divert resources to conduct investigations. But it does not allege that it was unable to conduct its programmatic activities. It alleges harm to its interests, not frustration of its activities.

Fourth, Marin Humane's diversion-of-resources-injury allegations are focused on the trucks that transport chickens to slaughterhouses: because there will allegedly be increased incidence of animal cruelty due to increased line speeds, Marin Humane (in its role as the county animal-services agency) will have to increase its monitoring of the trucks. But if Marin Humane plays no

---

[29] Am. Compl. – ECF No. 22 at 6 (¶ 13).

[30] Opp'n – ECF No. 26 at 19.

1    role with the slaughterhouses themselves, then it is not clear that Marin Humane has suffered an

2    injury that forces it to increase monitoring of the trucks. It perhaps chose to increase monitoring,

3    but on these allegations, the trucks are too removed from the slaughter lines for the resource

4    diversion to have been forced. It also is future harm.

5        Fifth, the Government Accountability Project alleges that in response to the 2018 decision, it

6    will have to develop outreach for private-sector as opposed to public-sector whistleblowers. This

7    is allegedly because the decision has caused more slaughterhouses to opt in to the New Poultry

8    Inspection System (because the decision applies to slaughterhouses that use that system), which

9    "removes federal inspectors from the front lines and replaces them with private sector

10   employees."[31] But the waivers that give rise to any injury in fact here are for line-speed increases;

11   the increased line speeds are what the plaintiffs challenge in this case.[32] Thus, any harm to the

12   Government Accountability Project's whistleblower program that forces a shift in resources is not

13   fairly traceable to the challenged conduct (the 2018 line-speed-waiver criteria) and instead is

14   traceable to the 2014 New Poultry Inspection System.

15       The Government Accountability Project also alleges that increased line speeds reduce or

16   eliminate inspectors' ability to see "food industry practices that compromise food safety (and

17   therefore such inspectors' ability to blow the whistle on food safety issues)," which in turn

18   frustrates the Government Accountability Project's mission and forces it to "shift resources to deal

19   with this issue."[33] These allegations might establish organizational standing if not for the fact that

20   "[u]nder the [New Poultry Inspection System], additional offline verification inspectors will check

21   to see to that inspection protocols are being followed and [will] conduct pathogen testing." *Food*

22   *& Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 916 (D.C. Cir. 2015). Because the "complaint

23   makes no allegation regarding the impact of increased offline verification inspectors," the court is

24

25

---

[31] Am. Compl. – ECF No. 22 at 17 (¶¶ 55–57).

26
[32] *See, e.g.*, *id.* at 50 (¶¶ 249–51) (discussing FSIS inspectors and alleging that "[w]aivers issued
27   pursuant to the 2018 Line Speed Increase Decision will cause an increased risk of loss of process
     control at those facilities that operate at higher speeds").

28   [33] *Id.* at 18–19 (¶ 62).

United States District Court
Northern District of California

1    "prevent[ed] . . . from inferring" that the Government Accountability Project has established an

2    injury in fact. *Id.* That is, it is unclear why the organization can't simply continue outreach to the

3    (now offline) public-sector inspectors and achieve the same result.

4          An overarching issue for all plaintiffs is that — despite the filing of the complaint in February

5    2020, after the 2018 decision and after waivers had been in effect for some time — their diversion-

6    of-resources-injury allegations are cast in future terms. That implies that the plaintiffs didn't suffer

7    injury. The amended complaint does allege a sharp increase in waivers shortly before the amended

8    complaint was filed in June 2020.[34] But plausible allegations in these circumstances require

9    current injury.

10         In sum, the plaintiffs have not established organizational standing.

11              **1.2.2  Associational Standing**

12         The plaintiffs contend that The Humane Society has associational standing.

13         "The doctrine of associational standing permits an organization to 'sue to redress its members'

14   injuries, even without a showing of injury to the association itself.'" *Or. Advoc. Ctr. v. Mink*, 322

15   F.3d 1101, 1109 (9th Cir. 2003) (quoting *United Food & Com. Workers Union Local 751 v.*

16   *Brown Grp., Inc.*, 517 U.S. 544, 552 (1996)). "[A]n association has standing to bring suit on

17   behalf of its members when: (a) its members would otherwise have standing to sue in their own

18   right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither

19   the claim asserted nor the relief requested requires the participation of individual members in the

20   lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

21         The defendants contest only the first prong: whether the members have standing to sue

22   themselves.[35] The Humane Society alleges that its members "are subject to aesthetic, health,

23   environmental, and/or other harm resulting from . . . slaughterhouses' operations, including from

24   the noxious stench emitted from such slaughterhouses," and that these harms "very likely have

25   been and will continue to be worsened because of the increased speeds at which such

26

27   [34] *Id.* at 3–4 (¶ 5).

28   [35] Mot. – ECF No. 25 at 24–27.

United States District Court
Northern District of California

1     slaughterhouses operate under the 2018" decision.[36] The defendants contend (among other things)

2     that The Humane Society must identify an injured member and that no member's injury is "actual

3     or imminent" because the organization alleges only that the injuries have "very likely" happened

4     (an allegation that, again, came after line-speed waivers were in effect for a time). These points are

5     related.

6         In *National Council of La Raza*, the Ninth Circuit addressed whether an organization must

7     identify its members by name to establish associational standing and said: "We are not convinced

8     that *Summers* . . . stands for the proposition that an injured member of an organization must

9     always be specifically identified in order to establish Article III standing for the organization." 800

10    F.3d at 1041 (citing *Summers v. Earth Island Inst.*, 555 U.S. 488 (2009)). "Where it is relatively

11    clear, rather than speculative, that one or more members have been or will be adversely affected

12    by a defendant's action, and where the defendant need not know the identity of a particular

13    member to understand and respond to an organization's claim of injury, we see no purpose to be

14    served by requiring an organization to identify by name the member or members injured." *Id.* The

15    Ninth Circuit thus held that the organizations had standing even though they did not identify their

16    members by name. *Id.* at 1037, 1041–42 (citing *Ala. Legislative Black Caucus v. Alabama*, 575

17    U.S. 254, 269 (2015)); *Cal. Rest. Ass'n v. City of Berkeley*, 65 F.4th 1045, 1063 (9th Cir. 2023)

18    ("[I]t's unclear whether the requirement that an organizational plaintiff specifically identify

19    injured members even applies at the pleading stage.") (Baker, J., concurring).

20        A plaintiff does not need to plead its evidence; it needs only to allege a claim plausibly.

21    The Humane Society thus need not identify particular members at the pleadings stage.

22        The question remains, though, whether The Humane Society has established that any

23    member's injury is "actual or imminent." *Cal. Rest. Ass'n*, 65 F.4th at 1049 (an injury in fact must

24    be "actual or imminent, rather than conjectural or hypothetical"). The Ninth Circuit has held that

25    "[t]o establish 'actual or imminent' injury, the [plaintiff] must show a credible threat that a

26    probabilistic harm will materialize." *Id.* (cleaned up). But that standard is for when the challenged

27

28    [36] Am. Compl. – ECF No. 22 at 7–8 (¶ 16).

ORDER – No. 20-cv-01395-LB                    16

United States District Court
Northern District of California

1   conduct, by its nature, poses a "threat of future harm." *Id.*; *Nat. Res. Def. Council v. EPA*, 735

2   F.3d 873, 878 (9th Cir. 2013) (where the challenged conduct "increases the threat of future harm,"

3   the "threatened harm is by nature probabilistic," and the court's "goal in these cases is to ensure

4   that the concept of 'actual or imminent' harm is not stretched beyond its purpose") (cleaned up);

5   *In re Zappos.com, Inc.*, 888 F.3d 1020, 1024 (9th Cir. 2018) ("A plaintiff threatened with future

6   injury has standing to sue if the threatened injury is certainly impending, or there is a substantial

7   risk that the harm will occur.") (cleaned up).

8        Here, by contrast, the challenged conduct was ongoing, the plaintiffs were subject to the

9   relevant sights and smells coming from slaughterhouses and transport trucks, and the issue is

10  whether those sights and smells worsened due to increased line speeds. If the increased line speeds

11  can cause harm to The Humane Society's members, that harm is already at hand. *Deal v. Mercer*

12  *Cnty. Bd. of Educ.*, 911 F.3d 183, 189 (4th Cir. 2018) ("[O]ngoing injuries are, by definition,

13  *actual* injuries for purposes of Article III standing."). Thus, it should be possible for the members

14  to allege actual harm.

15       That isn't the same as saying that certainty is required, though. When it comes to

16  environmental or aesthetic harms, the harm is (in some sense) "probabilistic" by nature, even if the

17  challenged conduct is already occurring. Thus, the plaintiff must be near the alleged harm and the

18  harm must be credible: "An individual bringing a substantive claim related to environmental

19  harms may establish an injury in fact by showing a connection to the area of concern sufficient to

20  make credible the connection that the person's life will be less enjoyable — that he or she really

21  has or will suffer in his or her degree of aesthetic or recreational satisfaction — if the area in

22  question remains or becomes environmentally degraded." *W. Watersheds Project v. Kraayenbrink*,

23  632 F.3d 472, 484 (9th Cir. 2011) (cleaned up); *see Ecological Rts. Found. v. Pac. Lumber Co.*,

24  230 F.3d 1141, 1151 (9th Cir. 2000) ("[T]o require actual evidence of environmental harm, rather

25  than an increased risk . . . , misunderstands the nature of environmental harm[.]").

26       The Humane Society has satisfied these standards by alleging that its members "spend time

27  near slaughterhouses" operating at higher line speeds and that the alleged aesthetic and

28

United States District Court
Northern District of California

1   environmental harms "very likely have . . . worsened because of the increased speeds."[37] It stands

2   to reason that higher line speeds increase the amount of slaughtered chickens, which increases the

3   aesthetic harms alleged. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S.

4   167, 185 (2000) ("[W]e see nothing 'improbable' about the proposition that a company's

5   continuous and pervasive illegal discharges of pollutants into a river would cause nearby residents

6   to curtail their recreational use of that waterway and would subject them to other economic and

7   aesthetic harms."). And The Human Society need not allege a more specific geographical nexus.

8   *Cal. Rest. Ass'n*, 65 F.4th at 1049 (at the pleading stage, "general factual allegations of injury

9   resulting from the defendant's conduct may suffice"). Thus, The Humane Society would have

10  associational standing if the issues around redressability were not present.

11      The defendants also contend that the plaintiffs have not alleged a sufficient procedural injury

12  to support their NEPA claim.[38] "To satisfy the injury in fact requirement" for "a procedural claim

13  under NEPA," a plaintiff "asserting a procedural injury must show that the procedures in question

14  are designed to protect some threatened concrete interest of his that is the ultimate basis of his

15  standing." *W. Watersheds Project*, 632 F.3d at 484. Here, The Humane Society satisfies that

16  requirement because it has standing as to independent concrete interests and the procedural NEPA

17  claim — that The Humane Society was deprived of environmental-impact information — is

18  directly related. The other plaintiffs cannot establish standing based only on the alleged procedural

19  injury, though.

20                              *        *        *

21      In sum, the court grants the motion to dismiss for lack of standing for all plaintiffs. The

22  dismissal is without prejudice.

23

24

25

26

---

27  [37] *Id.* at 7 (¶ 16).

28  [38] Mot. – ECF No. 25 at 28–29.

## 2. Failure to State a Claim

In their supplemental briefing, the defendants argue that the amended complaint does not state a claim under the APA because the 2018 decision was not final agency action.[39] The court's intent in allowing supplemental briefing was to permit only refinement of previous arguments.[40] *See TeleSign Corp. v. Twilio, Inc.*, No. CV 15-3240 PSG (SSX), 2015 WL 12662344, at *1 (C.D. Cal. Oct. 9, 2015) ("[A] court does not need to consider facts or arguments raised for the first time in a reply brief."). Given the justiciability issues that attend a changed regulatory landscape, the issue is better addressed in the context of an amended complaint.

## 3. Venue Dismissal or Transfer

The court reserves the issues of venue and transfer for consideration after the filing of any amended complaint. *See Immigrant Assistance Project of Los Angeles Cnty.*, 306 F.3d at 867 & n.20; *ACLU of N. Cal. v. Burwell*, No. 16-cv-03539-LB, 2017 WL 4551492, at *3–5 (N.D. Cal. Oct. 11, 2017) (analyzing § 1391(e) and pendent venue).

## CONCLUSION

The court dismisses the complaint with leave to amend. The plaintiffs must file any amended complaint with twenty-one days and must attach as an exhibit a blackline of the amended complaint against the current complaint. If the plaintiffs do not amend the complaint, the court will enter judgment in favor of the defendants. This resolves ECF No. 25.

**IT IS SO ORDERED.**

Dated: February 22, 2024

LAUREL BEELER
United States Magistrate Judge

[39] Defs.' Second Suppl. Br. – ECF No. 58 at 13–14.
[40] Order – ECF No. 54.